No. 31,374

NELLIE BRADY MORRIS, *Appellee*, v. SCHOOL DISTRICT No. 40 JOINT IN LYON COUNTY, *Appellant*.

(30 P. 2d 1094.)

Opinion filed April 7, 1934.

*Jay Sullivan, O. R. Stites* and *Gilbert H. Frith,* all of Emporia, for the appellant.

*Owen S. Samuel,* of Emporia, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by a school teacher, who was dismissed before her term of employment expired, to recover, from the school district which employed her, salary for the portion of the term remaining after dismissal. The verdict and judgment were for plaintiff, and the district appeals.

The statute pursuant to which plaintiff was dismissed reads as follows:

"The district board in each district shall contract with and hire qualified teachers for and in the name of the district, which contract shall be in writing, and shall specify the wages per week or month as agreed upon by the parties, and such contract shall be filed in the district clerk's office; and, in

conjunction with the county superintendent, may dismiss for incompetency, cruelty, negligence, or immorality." (R. S. 72-1026.)

Plaintiff alleged she was dismissed without just cause or legal excuse, that she was qualified (not incompetent) to teach, and had not been guilty of cruelty, negligence, or immorality. There was no allegation the board had not acted in conjunction with the county superintendent, there was no allegation of facts showing the board acted fraudulently, corruptly, or oppressively, and the petition did not state a cause of action.

It was for the board, in conjunction with the county superintendent, to determine whether there was just cause or excuse for dismissal. In the absence of fraud, corruption, oppression, or bad faith, all of which, for convenience, may be abbreviated to "bad faith," determination by the quasi-tribunal composed of the board and the county superintendent was final and conclusive. The court and the jury could have no concern with anything except the question of bad faith. A dismissal might be on such flimsy grounds that proof of the facts would be relevant to the issue of bad faith, but in cases of this character the issue is limited to bad faith in ordering dismissal, and the court and jury have nothing to do with the question whether the teacher should or should not have been dismissed.

"Section 6184, General Statutes of 1901 (R. S. 72-1026), provides for the employment of teachers and the manner of employing them in the district schools of the state. It also provides for the dismissal of teachers, the causes for which they may be dismissed, and the manner in which they may be dismissed; and where the district board, in conjunction with the county superintendent, dismisses a teacher, as provided by said section, such act of dismissal is final and conclusive, in the absence of fraud, corruption, or oppression." (School District v. Davies, 69 Kan. 162, syl., 76 Pac. 409.)

The answer alleged complaints were made to the school board that plaintiff was guilty of incompetence, cruelty, and negligence, that the board investigated the complaints, and that, on a full hearing before the board and the county superintendent, the board, acting in good faith, without fraud, and with reasonable discretion, and with the consent and concurrence of the county superintendent, dismissed plaintiff. It will be observed the answer did not allege plaintiff was incompetent, cruel, or negligent, but merely alleged regularity of conduct on the part of the board, acting in conjunction with the county superintendent, in making the dismissal, and the answer stated a full defense. The reply denied that plaintiff

was guilty of incompetence, cruelty, or negligence—something not charged—denied that the board acted in good faith, and alleged that the board, acting in conjunction with the county superintendent, had been guilty of bad faith, fraud, corruption, and oppression.

At the close of the opinion in the case of *School District v. McCoy,* 30 Kan. 268, 1 Pac. 97, appears the following paragraph:

"In the case of *Neville v. School Directors,* 36 Ill. 71, 73 *et seq.,* it was held that the directors of a school district may undoubtedly discharge a school teacher for incompetency or neglect of duty; but that afterward, if they are sued by the teacher for the sum agreed to be paid him, it devolves upon the directors to show that the teacher was dismissed for incompetency or neglect of duty, and that in fact he was incompetent, or that he neglected his duty." (p. 278.)

The purpose of inserting the paragraph in the opinion is not clear. Whatever the purpose, the Illinois decision is not in accord with the settled law of this state relating to conduct of persons, boards and bodies constituting quasi-tribunals for special purposes, such as school boards, and the burden rested on plaintiff to prove her case.

Plaintiff's testimony disclosed that she had difficulty in maintaining discipline in the school, and she consulted the county superintendent about it. Chester Garriott, a patron of the school, had a lawyer prepare a petition for dismissal, which was afterwards circulated and presented to the school board. Before this was done, Garriott advised Dale Curry, director of the district, about it. Garriott believed "there was enough complaint in the district, there was lots of it, plaintiff was continually whipping some of the children all the time," and Curry told Garriott to go ahead.

Plaintiff was advised by the board that the Christmas vacation of 1932 would be extended. Her testimony, as it appears in her counter abstract, was that she was—

"Never advised by the board that she was to be let out until advised they were extending the vacation."

On January 7, 1933, plaintiff received a notice from the county superintendent to appear at the superintendent's office on January 10, to show cause why she should not be removed from the position of teacher of the district, on the ground of cruelty. On January 7 plaintiff, her husband, her attorney, and Curry, were at the county attorney's office. The superintendent asked plaintiff to resign, she refused, and she was immediately served with the notice to appear and show cause. The superintendent said she had complaints of patrons.

On January 9 a meeting occurred at the superintendent's office. Plaintiff, the superintendent, and two members of the board were present.

On January 10 the formal meeting was had. Plaintiff, the superintendent, all the members of the board, and several patrons of the school, were present. In her testimony plaintiff did not tell what occurred at the meeting concerning her conduct as a teacher. Plaintiff was asked if she had anything to say, and she replied that, on the advice of counsel, she had nothing to say. After the meeting the members of the board handed plaintiff a notice in writing, approved and concurred in by the superintendent, dismissing plaintiff as teacher on the grounds of incompetence, cruelty, and neglect.

The testimony thus far summarized not only failed to establish a cause of action in favor of plaintiff, but established the defense pleaded in the answer. A demurrer to plaintiff's evidence was overruled, and her evidence may now be further canvassed to discover what there was, if anything, to show the board and superintendent acted in bad faith, as broadly defined above.

When plaintiff consulted the superintendent with reference to the difficulty plaintiff was having with discipline in the school, plaintiff was advised by the superintendent to punish the children unless they did exactly what she said. Afterwards the superintendent advised and requested plaintiff to resign, and approved her dismissal. The testimony had no tendency whatever to show that plaintiff was led into a trap by the superintendent, that the subsequent change of attitude on the part of the superintendent was not justified, that the superintendent was insincere in demanding plaintiff's resignation, nor that the superintendent had a bad motive in joining the board in dismissing her.

Plaintiff testified that no member of the board made complaint to her of her teaching, or visited the school during the four months she taught in 1932, although several of the patrons did visit the school. When plaintiff found she was losing control of her school, she did not consult her school board. She took her troubles to the county superintendent; and it is not likely plaintiff would admit her failure to confer with the board constituted bad faith. However, the fact that the members of the board did not go to the school, or to the teacher, get her version of things, and consult and advise with her, contains no implication and warrants no inference that they acted fraudulently, corruptly, or oppressively; dishonestly, insin-

cerely, or hypocritically; with guile, deceit, or simulation; or with any other kind of obliquity which may be indicated by the term bad faith. To make a case out of failure to confer, it was necessary for plaintiff to prove the board kept away from her through some bad motive, and she had no such proof.

Suppose the board or some member of it had asked plaintiff for her version of the whipping of Millard Hosfelt. Presumably plaintiff would have given the same account she gave under oath as a witness in her own behalf. Her testimony is abstracted as follows:

"That she whipped Millard Hosfelt twice with a stick; that she didn't whip him hard enough to cause any marks on him; that she whipped him on the legs below the knees; that he was whipped for disturbing the other children, and not getting his lessons. . . . That the Hosfelt child was whipped with a stick, and that she broke it on him.

"Q. You say to this jury that you know you didn't make marks (on Millard Hosfelt) because you have whipped children on the arms and it didn't make any marks on the arms? A. Yes.

"Q. On that you base your judgment that you didn't make any marks on the boy? A. I didn't make any marks to stay as long as that.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Whipped Hosfelt boy about the legs, he had on boots at the time, did not whip him hard, he did not even cry."

Dale Curry, the district director, testified as follows:

"That Mrs. Dewar, grandmother of the Hosfelt children, called him on the telephone, and he (the witness) went over to see her; that Mrs. Dewar told him one of the children bore marks, and the witness told Mrs. Dewar to take the child to Mrs. Spellman, the county superintendent."

Ruth Hosfelt testified as follows:

"That she is the mother of Millard Hosfelt; that on Saturday after Millard had been whipped on Wednesday she observed the marks on her little boy when she gave him a bath; that there were black and blue marks along his legs, across his back, and underneath his hip; that she took her little boy to the county superintendent on the following Monday for examination."

Millard Hosfelt testified as follows:

"That the plaintiff had whipped him twice during the four months of the present term, for not knowing his geography on one occasion, and his English on another. That she used a stick a little bigger than his thumb, and left marks on his legs, and that he did not cry. . . . That the marks which had been made by whipping were exhibited to Mrs. Spellman, county superintendent, about three or four days after the whipping."

Mrs. Edith Spellman, the county superintendent, testified as follows:

"That Millard Hosfelt was brought into her office just before Christmas, and there were black and blue welts on the boy on the lower part of his back and hips."

Under these circumstances, it cannot be said the board or the superintendent acted flagrantly because they did not consult plaintiff about the Hosfelt case.

Returning to the testimony which constituted plaintiff's case when the demurrer was filed, plaintiff testified that at one of the meetings with the superintendent, the superintendent said:

"It is my best advice to you to resign, as you are told—we will make you resign."

Plaintiff also testified the superintendent told plaintiff that if she did not resign they would dismiss her. There was no evidence whatever that the superintendent was not just as sincere as she was frank, and herein lies one of the fundamental defects in plaintiff's case. There was no proof of any conduct on the part of the board or the superintendent which was *malum in se*. Pointing to the fact of conduct, plaintiff in effect says, see the bad faith—when there is nothing in the inherent quality of the conduct, nor the circumstances of its manifestation, to condemn it.

Lloyd Morris, plaintiff's husband, was a member of the group in the county attorney's office on January 7. Morris testified the superintendent had talked to his wife previously. He said he heard the conversation in which the superintendent said she had talked with the little girls and their parents concerning the whipping at school, and the superintendent told plaintiff if she did not resign they would make her resign. He also testified he heard the superintendent say to Curry, "If we stick together, I think we will win out."

Whether there was effort to stifle dismissal is not disclosed. No clue is given to what prompted the superintendent's remark. To accomplish dismissal, the board and the county superintendent were required by the statute to act in conjunction. The superintendent was privileged to urge Curry or any other member of the board to join in accomplishing, or to remain steadfast in accomplishing, what was deemed to be necessary for the good of the school. Plaintiff produced no evidence that, in seeking to effect plaintiff's resignation or dismissal, the superintendent was moved by any improper influence or desire, and the testimony furnished no basis for giving the remark a sinister meaning.

There was nothing else of consequence in plaintiff's evidence about conduct of the school board and the county superintendent, and the demurrer to the evidence should have been sustained.

Plaintiff gave a pretty full account of the exemplification of her disciplinary method, which was to spank, box ears, hit on the head, whip with a board, and whip with switches and sticks. Plaintiff stoutly disclaimed severity of punishment, and put on the witness stand some children who, strange as it may seem, were allowed by the district court to testify the teacher was not cruel. The result was, plaintiff's evidence proved her punishment would end in farce. The whippings occurred in the hall, and "the big kids" came back into the schoolroom laughing.

The little children came back crying. Marie Hosfelt was six years old. It was her first term in school. It seems Marie had no comprehension of the fact that the ills of this troubled world can be alleviated, and that civilization can be saved from decay and dissolution only by education of the young. Apparently, also, Marie had no appreciation of the great expense to which the taxpayers had been put in erecting the schoolhouse, maintaining the school, and providing her with a teacher. So Marie would whisper; and when there was nothing going on that interested her, she would get down and crawl in the aisle. The remedy was to whip her. The Kirby girl, the Meadows girl, and the Kane boy, all six years old, were whipped, and there was no remedy for breach of discipline but the trip to the hall and back. If a boy was a "time waster," he was whipped. If a boy could not say his 8's and 9's, he was whipped. If a girl could not speak her piece, she was whipped. If a child could not say its letters, it was whipped; and so on, *ad nauseam*.

Plaintiff testified some of the mothers asked her not to punish their children, because they were afraid to go to school. Plaintiff specified one instance, that of a boy, and testified she did not punish him any more. At the meeting on January 10 another mother stated she told the school board her little girl was nervous after she was whipped, was afraid to go to school, and cried about going to school. Whether this mother was one included in plaintiff's testimony is not disclosed. At the trial of the case Mrs. Kirby testified that her child, Maxine, aged six years, cried every morning for nearly two weeks because she was afraid; the teacher had threatened to whip her if she did not get her lessons. Leaving this testimony at

one side, plaintiff admitted enough to show that, at the most impressionable school age, children were marked with a mark far worse than welts on the body—fear to go to school.

As indicated above, the patrons of the school became aroused. Petition for dismissal of plaintiff was circulated. The Christmas vacation was extended. A complaint was filed, and a warrant was issued for the arrest of plaintiff on the charge of assault and battery. This was not done at the instigation of the board or the superintendent.

The court has been obliged to mention nature, extent and consequences of the corporeal punishment administered to pupils, because, under the issue involving conduct of the board and superintendent, plaintiff made her conduct a chief feature of the case.

It is perfectly idle to contend a subject demanding consideration and action by the board was not brought to the board's attention. The body appointed by the law to consider and act on the subject dismissed her. That ended investigation of the merits of the dismissal and of the method by which the conclusion to dismiss was reached (*Allen v. Burrow*, 69 Kan. 812, 821, 77 Pac. 555; *Allen v. Burrow*, 69 Kan. 877, 77 Pac. 1133). The function of the district court was limited to investigation of whether the dismissing body was guilty of bad faith, fraud, corruption, or oppression. Those are terms of opprobrium. What they connote must be established by proof, and not by innuendo or exercise of the faculty of imagination, and plaintiff produced no evidence of bad faith.

There remains for consideration the question whether evidence of fraud, corruption, oppression, or bad faith, which plaintiff failed to produce, was subsequently supplied.

In considering defendant's evidence, it must be kept in mind the board, acting in conjunction with the superintendent, did not constitute a court, or anything resembling a court. The board did not act judicially, was not bound to follow any specific procedure, and was not bound by rules of evidence applicable to trial of actions. The members were not supposed to be learned in the law. If they were required to proceed in conformity to the regular course of the common law, they would be disqualified from making any investigation. Members of the board and the county superintendent could make their investigations in their own way. They were not required to examine witnesses, or to resort to any particular class of evidence. They were judges of what they would rely on, and could accept the

statements of persons on whom they chose to rely. It was not necessary that each one should individually investigate every complaint, and any one of them could rely on information obtained and communicated by another member and by the county superintendent. The principles on which these declarations are made were established by or follow from the decisions in the cases *School District v. McCoy*, 30 Kan. 268, 1 Pac. 97; *Symns v. Graves*, 65 Kan. 628, 70 Pac. 591; and *Meffert v. Medical Board*, 66 Kan. 710, 72 Pac. 247, which have been approved and followed many times. Failure to recognize these principles constitutes the other chief defect in plaintiff's case.

In her brief plaintiff catalogues the things the children did. The children displayed no originality. They did the same things which were done in school when the writer first went to school, when later he taught school, and when his children went to school. The conduct constituted a common problem of school government with which every teacher of a school of lower mixed grades must cope. Plaintiff dealt with the problem in a manner which threw the district into turmoil. Her brief continues as follows:

"It is hardly likely that an unbiased district board would have removed the teacher had it been advised that the teacher only spanked the smaller ones, and used only small switches on the others."

It is not necessary to consider what an unbiased board would have done on such information, because the members of this board had other information which cannot be reconciled with plaintiff's testimony or brief. The Hosfelt incident has been given in full. In connection with her testimony relating to that incident, the superintendent testified further as follows:

"A little girl was brought into the office with marks on her face. After these youngsters were brought into the office the witness talked with the plaintiff particularly about a little boy who was presumed to have been hit by the plaintiff with a book which had caused a gathering in his head; plaintiff admitted she had struck the boy with a book; this conversation with the plaintiff occurred Monday or Tuesday before Christmas; . . ."

On January 10, and pursuant to the notice calling on plaintiff to show cause why she should not be discharged, a meeting was held. The course of the proceeding at the meeting was the other way around. Practically all the patrons of the school were present. Some of them made statements. Some eight or nine pupils were present, and were questioned in plaintiff's presence, and thus a

showing was made to plaintiff why she should be discharged. At the conclusion of the meeting plaintiff was requested to make some explanation, and she declined to do so on the advice of counsel.

Counsel for plaintiff scoffs at the meeting, and calls it a smoke screen, a subterfuge, and names more uncomplimentary. The court is not inclined to give weight to this imputation against the sincerity of substantially the whole body of patrons of a school district. It is not likely they were creating a smoke screen for the protection of misdemeanants, or were perpetrating any subterfuge; and it is not likely they were allowing themselves to be used by misdemeanants to create a smoke screen or perpetrate a subterfuge. There is not the slightest ground for regarding this meeting as having any object or purpose other than serious consideration of a subject of grave importance to the school district, and if the decision to dismiss the teacher was corrupt, it did not acquire its taint from that meeting.

After complaints had reached the board, members consulted the county attorney to find out what their own liability might be if some of the children should be hurt. The county attorney postponed answer, and they consulted another attorney. They also consulted their attorney with respect to grounds on which a teacher might be dismissed.

After complaints from patrons had been made to Mrs. Kipfer, treasurer of the district, she talked with other members of the board, and had made up her mind to dismiss the teacher before they consulted their attorney. From the investigation of complaints and the hearing on January 10, she believed the teacher was cruel and incompetent.

Complaint came to Mrs. Hess, the clerk of the board. She did not personally investigate the complaints, but she talked with other members of the board who related the results of their investigations, and discussed the situation with them. Before the hearing she was of the opinion the board should not let the condition go on as it was. If plaintiff had made some reasonable explanation about the whippings, her opinion might have been changed, but since plaintiff offered no explanation, she believed she was doing the right thing to vote to discharge the teacher.

Complaints came to Curry, the director. As indicated above, he had the Hosfelt boy taken to the county superintendent. He also had the little McGregor girl, who had a bruise under her eye, said

to be made by a blow with a book, taken to the superintendent. He made two trips over the district and took statements of mothers and children. He talked with other members of the board. He told the teacher the Christmas vacation would have to be extended because a complaint had been filed against her with the county attorney. Before the hearing on January 10 he and the board had concluded the teacher was cruel to the children, and so incompetent. Before the meeting the board had determined to dismiss the teacher, but the superintendent had not concurred. They had the hearing to lay before the superintendent facts which had come to notice of the board, and to decide on dismissal.

The hearing on January 10 was held in the courthouse in Emporia, the county seat. When the members of the board went to town, the first thing they did was to have their lawyer prepare an order of dismissal of the teacher, and prepare for their record a form of minutes of a meeting showing adoption of a resolution of dismissal. This had been agreed on at a conference held in the district, and it had been agreed the teacher should be dismissed if the evidence at the meeting substantiated the charges.

Curry testified as follows:

"The board was of the opinion that the teacher was cruel in the administration of the school, and that it was to the best interests of the district and the teacher that she should be discharged, and that it was the duty of the board, after the investigation it had made and after the hearing in the county superintendent's office, to dismiss the teacher on the ground of cruelty; that he had no personal feeling against the plaintiff; had no children in school. . . . The notice of discharge was signed by the board while they were in Emporia, at the conclusion of the hearing held in the county superintendent's office."

A juror was granted permission to ask plaintiff some questions. In reply, plaintiff testified as follows:

"She had taught the school for one full term and four months of the present term, before she was discharged; she had thirty-seven pupils, ranging in age from five to fifteen years; none of the parents or school board came to the schoolhouse to consult with the teacher and find out about the matters in controversy."

She further testified the county superintendent had not come to the school to visit it and talk matters over.

Plaintiff's brief does not complain because the superintendent did not drive out to the schoolhouse to confer with plaintiff. On the other hand, the brief contains the following:

"She (plaintiff) then went to the county superintendent, and talked with

her on two or three different occasions prior to January 9. She discussed with the county superintendent her side of the controversy, so it is fair to assume the county superintendent had personal knowledge as to the teacher's claims."

Plaintiff does insist members of the board were guilty of bad faith because they did not visit the school, confer with plaintiff, and get her version of her troubles. This subject has been discussed. If the members of the board had avoided conference with plaintiff from some improper motive, the fact might have been of some importance, but there was no evidence they did so. Mrs. Kipfer said she did not know why the board did not confer with the teacher before consulting an attorney—"they just didn't." Mrs. Hess said the reason she did not confer with the teacher was, "I just didn't think it would do us any good." Curry said, "I did not know enough to handle the teacher." If these statements were true, they furnished no basis for inference the members of the board acted from any unworthy desire. If the statements are not to be believed, there is no evidence in the record they did act from any unworthy desire.

There is left for consideration but one proposed basis for an inference—not that the members of the board might have pursued a better course, not that they might have acted more wisely—but that they were guilty of some kind of conduct which was reprehensible. The proposed basis is this: The members of the board made up their minds and agreed to dismiss plaintiff before the meeting occurred at which plaintiff was to be heard.

Of course the members of the board had made up their minds what to do, before the meeting. They were not acting in the capacity of jurors who must not form or express an opinion until the cause is finally submitted, and when they got what they believed to be the facts, integrity of mental process led inevitably to conviction. The fact they had concluded the teacher should be dismissed is no evidence the conclusion was corruptly reached or corruptly held. Convinced the teacher should be removed, they gave her a hearing at which their evidence was fully disclosed to her, and asked her what she had to say. She had nothing to say, and they closed the episode in the way they expected it would be closed, and in the way they had prepared to close it—by dismissing her.

Without further discussion, the court holds there was no sound or just basis for an inference the members of the school board or the county superintendent acted other than in the honest discharge of what they conceived to be their duty.

The board was required by statute to act in conjunction with the county superintendent, and did so. The fact that the joint action of dismissal occurred outside the territorial limit of the school district did not detract from the validity of the dismissal.

As indicated, the demurrer to plaintiff's evidence should have been sustained. At what was supposed to be the conclusion of the testimony, defendant moved the court to direct the jury to return a verdict in defendant's favor. This motion should have been sustained. The case was then opened for reception of a little more evidence, and for the juror's questions to plaintiff. Nothing was presented which supplied evidence of bad faith on the part of the board and the superintendent.

The judgment of the district court is reversed, and the cause is remanded with direction to render judgment in favor of defendant.