No. 46,823

FREDRICK C. HAMANN, *Appellant—Cross-Appellee*, v. L. C. CROUCH, President of the GARDEN CITY COMMUNITY JUNIOR COLLEGE; and JOHN COLLINS, JAMES CONCANNON, JR., EDWIN HOOPER, KATHERINE JONES, PAULINE JOYCE and JOHN NANNIGA, Trustees of the Board of the Garden City Community Junior College, *Appellees—Cross-Appellants.*

(508 P. 2d 968)

Opinion filed April 7, 1973.

*Lelyn J. Braun*, of Garden City, argued the cause and was on the brief for the appellant and cross-appellee.

*Daniel J. High*, of Malone and Dwire, of Wichita, argued the cause and was on the brief for the appellees and cross-appellants.

*Ward C. Martin*, of Crane, Martin, Claussen, Hamilton and Barry, of Topeka, was on the brief for Kansas-National Education Association, as *amicus curiae.*

The opinion of the court was delivered by

KAUL, J.: Fredrick C. Hamann, appellant and cross-appellee, brought this action to recover damages for breach of contract or, in the alternative, for relief by way of mandamus compelling

appellees and cross-appellants to tender him a teacher's contract for the school year 1970-71.

The issue is whether appellant was entitled to be reinstated to his former teacher's position after a leave of absence (or sabbatical) under the provisions of the college policy regulations, which were incorporated by reference in Hamann's contract of employment. The section of the regulations with which we are concerned relates to leaves of absence, the pertinent sentence thereof which gives rise to this controversy reads:

"Professional employees granted leaves will, if possible, be reinstated in positions that are similar to the position held when granted the leave."

In short, Hamann claims the sentence means that he had an absolute right to reinstatement and that "if possible" it would be in a position similar to that previously held. Appellees, on the other hand, interpret the sentence to mean that acceptance of a leave of absence by an employee, terminated his contract and that if he desired to return he would be reinstated "if possible"—meaning reinstatement only if a position were available. Appellees further claim that Hamann accepted his leave with knowledge of their interpretation and thus was bound by it.

Hamann had been employed by the Garden City Community Junior College as a teacher since 1965. In March 1969 he signed a contract to teach during the ensuing school year. Thereafter, Hamann's application to take a one-year teacher training course with Oak Ridge Associated Universities, Oak Ridge, Tennessee, was accepted and he requested a leave of absence from appellees. Hamann's requested leave was granted on May 23, 1969. Hamann proceeded to Oak Ridge in the summer of 1969. In February of 1970 Hamann wrote appellees indicating that he desired to return to his former position for the school year 1970-71. After some correspondence back and forth, between Hamann and appellees, Hamann was notified, prior to March 15, 1970, by Dr. Robert L. Foree, assistant to the president, that there would be no position available for him during the 1970-71 school year. Hamann commenced making applications to numerous other schools for a teaching position, but was unsuccessful. He returned to his home in Garden City where he found employment with the Pueblo Chemical Company where he earned $750.00, and later secured employment with the Western Alfalfa Company where he earned $1,098.58 during the summer and fall of 1970.

In the meantime, after receiving notice from Dr. Foree, that he would not be reinstated, Hamann informed the National Faculty Association of his situation; this led to an investigation by the Kansas-National Education Association (KNEA), who sent a representative, Bill Hobbs, to Garden City. Apparently, the board of trustees of the college granted a hearing to Hobbs on the matter. Hamann testified that Bill Hobbs and the KNEA represented him quite properly, and that he had no complaint concerning the hearing. Hamann had no further dealings with appellees after the KNEA assumed representation of him.

Hamann filed his petition on June 12, 1970, basing his claim on the theory that appellees' refusal to tender him a contract for the school year 1970-71 constituted a violation of the school's regulations relating to leaves of absence; that the leave of absence constituted a continuation of his contract to teach; and that in truth and fact he was still a member of the staff. Appellees answered alleging that Hamann's leave of absence did not create a continuance of his then existing contract; that under the terms of the college regulations, incorporated into the contract by reference, together with the mutual understanding of the parties, the contract terminated at such time as Hamann left the staff of the college.

The contract under which Hamann was employed was dated March 17, 1969. It provided for a salary of $9,928.00, payable in twelve equal installments. It also provided for employment for a term of nine months commencing September 1, 1969, and that Hamann's basic assignment was "Biological Sciences and Mathematics with related activities. Responsible to the Dean of Academic Affairs." in accordance with the rules, regulations and policies of the college.

After hearing the testimony, which for the most part was undisputed, the trial court made extensive findings of fact and conclusions of law.

The essential facts are set out in findings Nos. 5, 6, 7 and 8 which read:

"5. That at the time of the granting of the sabbatical leave the parties were dealing with each other at arm's length; that the defendants were careful in their dealing with the plaintiff to always state the leave was being granted in accordance with the provisions of said Section 17 and to go no further. That at the time he accepted the sabbatical leave the plaintiff knew that it was the defendants' interpretation of Section 17 that they would not be required to re-hire him unless there was a similar position open at the time

of his re-application. The plaintiff consulted an attorney and was informed that in the attorney's judgment the defendants were required to re-hire the plaintiff even though a similar position might not be open.

"6. That the policy manual, which is Plaintiff's Exhibit 4, was prepared by the defendants; that the form of contract used, which is Joint Exhibit 1, was prepared by the defendants, and that by its terms the policy manual is made part of the contract. That any ambiguity in the policy manual is to be construed against the defendants since they prepared it.

"7. That during the period which the plaintiff would have been employed by the defendants if he had been reinstated, to-wit: The school year from September 1st, 1970, to May 16th, 1971, the plaintiff endeavored to find work both in the teaching profession and in other lines of work and had actual earnings of $2491.63. That during this period employment was available in this community from which the plaintiff could easily have earned at least $100.00 a week and could have earned $3600.00 had he made diligent effort to do so.

"8. That a position exactly similar to the position held by plaintiff at the time he took his sabbatical leave was not available at the time he requested re-employment; that in order to have re-employed the plaintiff defendants would have had to juggle schedules and could not have re-employed plaintiff full time without creating extra classes or firing other teachers who had been employed. That this situation resulted from the curriculum planning and scheduling done by the defendants and by the failure of the defendants in doing their planning to provide a position for the plaintiff upon his return from sabbatical leave. That had the defendants known that the plaintiff would have the right to be re-employed that they could have so arranged their schedules as to provide a place for him upon his return, but that this would have had to have been done by hiring replacement teachers for one year only at the time replacements were hired to replace the plaintiff while he was on sabbatical leave, but this was not done because it was the defendants' position that they would not have to re-employ him."

The trial court concluded that since the rules and regulations were drawn by appellees any ambiguity was to be construed against them and thus the meaning of the sentence in question was held to be "that the person granted the leave will be re-employed and that if possible, he will be re-employed in a similar position."

The trial court further concluded that appellees were entitled to credit by way of mitigation of damages in the amount which Hamann could have fairly and reasonably earned had he made a diligent effort to do so.

In conclusion No. 3 the trial court stated:

"The court concludes that even though the plaintiff knew at the time he accepted the sabbatical leave that the defendants were interpreting the leave to mean that they would not have to re-employ him unless they had provided a similar position that he was entitled to rely upon the written contract regardless of the interpretation placed upon it by the defendants. The parties

were dealing at arm's length. The plaintiff was aware that the defendants were probably intending to use this as a means of easing him out of their employment and chose to accept his legal rights under the contract and take his chances upon his lawyer's interpretation of the contract being correct. This the plaintiff had the legal right to do."

Judgment was entered for Hamann in the amount of $9,928.00, less the sum of $3,600.00 for mitigation of damages.

Hamann appeals claiming error by the trial court (1) in refusing to order reinstatement; (2) in refusing to hold that appellant to mitigate his damages had only to pursue employment as a teacher or similar professional work; and (3) in refusing to award further damages including attorney fees.

The appellees filed a cross-appeal specifying as points:

"1. Appellant knew the meaning afforded the leave policy by college officials before he accepted same and he should be held to that interpretation.

"2. The Trial Court was in error in placing its own interpretation on the leave policy, in view of the expressed meaning manifested by college at the outset.

"3. The Trial Court was in error in finding that defendant [plaintiff] should have been re-employed in an area wherein he had no teaching experience."

The KNEA was granted leave to file a brief *amicus curiae* in which it briefed points relating to reinstatement and mitigation of damages.

Both parties treat the regulation in question as being ambiguous. The trial court so found and in reaching its conclusion relied upon the elemental rule of contract construction that when ambiguity appears it is to be construed against the drafter of the instrument—in this case appellees. On the other hand, appellees, in support of their cross-appeal, vigorously assert that the general rule mentioned above is not applicable here, since Hamann well knew the interpretation of appellees, but, nevertheless, accepted leave of absence under those conditions. The appellees say that in view of the trial court's conclusion that Mr. Hamann knew of the appellees' interpretation, at the time he accepted his leave, it was error not to construe the regulation in accordance with the interpretation of appellees. We believe the position taken by appellees in this regard framed the critical issue which is dispositive of this appeal.

Before discussing applicable principles of law, a further examination of the undisputed facts is necessary.

Mr. Hamann made application to attend the Oak Ridge institu-

tion on his own without notice to, or discussion with, any of the college officials. Before his application was accepted, Hamann signed his contract with appellees on March 17, 1969, which bound him and the college for the next school year. On May 20 Hamann received notice of acceptance from Oak Ridge. He talked to some fellow staff members, but took no further steps at the college at the time. Hamann took the policy manual to his neighbor, Mr. Fleming an attorney, and discussed the leave regulation with him. Mr. Fleming made some suggestions as to how Hamann should prepare his letter requesting leave. Mr. Hamann did not inform Mr. Fleming as to the college's interpretation of the leave policy which was unknown to him at that time. On May 23, 1969, Hamann wrote his application for leave in the form of a letter, addressed to President Crouch and the Board of Trustees. Hamann made no mention of his interpretation of the leave policy except what might be inferred from this sentence:

"After completing my studies at Oak Ridge, I will be looking forward to returning to present position here at Garden City Community Junior College. I feel that training at the National Atomic Energy Commission Laboratory could bring a great deal of credit to both Garden City Community Junior College and myself."

On May 26, 1969, Hamann received a letter from President Crouch granting the requested leave. The letter included this proviso:

". . . [I]n accordance with Board of Trustee Policy—Sabbatical Leave, Article III, Section 17, of present policy manual. The policy states that employee will, if possible, be reinstated in a position that is similar to the position held when granted leave."

After receipt of this letter, Hamann had conversations with President Crouch and with Edwin S. Hooper, chairman of the board of trustees. As a result of their conversations, Hamann was fully informed as to the position of the college. However, Hamann did not tell either Crouch or Hooper that he held to a different interpretation. On this point he testified, "I just told Mr. Hooper if this is the way it was interpreted I didn't feel that they had a leave policy at all." After being informed of the college's interpretation, Hamann did not seek further advice from Fleming in view of this development, but proceeded to take his leave of absence regardless of consequences. Since Mr. Fleming was not made aware of the college's interpretation, his advice to Mr. Hamann was of little value.

Under the terms of his contract, Hamann did not have an absolute right to a leave, it was a matter of discretion with the board of trustees and was granted in accordance with its interpretation that Hamann would be reinstated if possible. Hamann, of course, was not obliged to accept the leave under those conditions, but his acceptance without conveying his interpretations to Crouch or Hooper binds him to the interpretation given.

The effect of the board's granting Hamann's requested leave, and the acceptance thereof by Hamann, was to relieve Hamann of his obligation to teach for the ensuing year and, likewise, to relieve the board of its obligations to Hamann under the employment contract. In other words—at that point—the contract of the parties was that Hamann was entitled to a leave of absence under the terms and conditions of the policy regulations relating thereto. Thus, the issue in this case concerns the rights of the parties under the conditions of the leave policy regulation, rather than the rights and duties of the parties under the contract of employment and the continuing contract law. (K. S. A. 72-5410, *et seq.*) In any event, it is undisputed that Hamann was notified prior to March 15, 1970, that he would not be reinstated and, as previously noted, Hamann conceded that he was granted a hearing and was properly represented by Bill Hobbs and KNEA.

Turning to the leave regulation in question, as we have noted, both parties concede there is ambiguity in the application of the words "if possible" to the reinstatement provisions of the regulation. A cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistent with legal principles. (*Springer v. Litsey,* 185 Kan. 531, 345 P. 2d 669; 17 Am. Jur. 2d, Contracts, § 244, p. 631-632.) Where actual ambiguity exists in a contract, oral testimony disclosing an operative interpretation by the parties is admissible and is of controlling significance. (*Lawrence v. Cooper Independent Theatres,* 177 Kan. 125, 276 P. 2d 350; *In re Estate of Koellen,* 162 Kan. 395, 176 P. 2d 544; and *Shannep v. Strong,* 160 Kan. 206, 160 P. 2d 683.) In the instant case, the operative interpretation of appellees was made clear, Hamann did not like it, but he did not inform appellees of his contrary interpretation; he accepted his leave and went on to Oak Ridge.

It is a generally recognized principle that where one party to a contract knows the meaning that the other party intended to convey by his words then he is bound by that meaning. (3 Corbin on Con-

tracts, § 538, p. 64; 17 Am. Jur. 2d, Contracts, § 248, p. 641; 17A C. J. S., Contracts, § 295, p. 68; *Cresswell v. United States*, 173 F. Supp. 805; *Hurd v. Illinois Bell Telephone Company*, 136 F. Supp. 125, and *Bowers Dredging Co. v. United States*, 211 U. S. 176, 53 L. Ed. 136, 29 S. Ct. 77.)

In the case of *Hardware Co. v. Donovan*, 74 Colo. 350, 221 Pac. 881, dealing with an ambiguous written contract of employment, the Supreme Court of Colorado applied the rule and succinctly stated it in this fashion:

"A party will be held to that meaning which he knew the other party supposed the words to bear. [citing cases]," (p. 353.)

For many other applications of the rule see cases catalogued in 17A C. J. S., Contracts, § 295 [footnote 53], p. 68.

We believe the foregoing rule is particularly applicable to the undisputed facts in the instant case. Application of the rule is limited in that it cannot be used as a vehicle to write a new contract for the parties and should be applied only when warranted by the facts such as in the case at bar. Here the facts fall precisely within the contemplation of the rule.

The court found, and Hamann admitted, that the college's position was made clear to him, but he made no effort to convey to the college his understanding of the leave provisions; if he had done so it is likely his request for leave might not have been granted. It is quite true, as Hamann suggests, the benefits of the leave policy are nominal. The inability of a small college to provide leave privileges, such as those usually granted by larger institutions, was pointed out by President Crouch who, when questioned concerning the leave policy described it in this fashion:

"A. As the interpretation of the understanding of the policy when it was incorporated, the fact we are not as of a size of an institution that you would be able to absorb a leave of absence and hire someone to come in and then guarantee someone a position when they return.

"Q. This is what, because of the size of the college?

"A. Because of the size of the institution that we have, and the leave of absence policy was better than nothing at all, which they had been operating on for years, a few years with not any policy at all. At least it was better than nothing.

"Q. Under your interpretation what benefits, if any, does accrue to the instructor who is operating under this policy?

"A. It gives him an opportunity to go away for additional training and possibility that if there is a position available or from when he left he would be considered for the position when he returns."

Hamann undertook his course of action with full knowledge of the risks involved. When he was questioned by the court in this regard he testified that at the time he made his decision to go ahead and accept the leave he knew that as far as Dr. Crouch and Mr. Hooper were concerned they interpreted the leave policy the other way. He further testified that he knew he was taking a chance.

Under the rule quoted, as applied to the facts of this case, a court cannot substitute its interpretation of the policy regulation on leave for the expressed meaning given to Hamann by the college president and chairman of the board of trustees.

The trial court found that appellees could have employed Hamann to teach in areas for which he had no special qualifications and that if appellees had known Hamann had the right to be reemployed they could have so arranged their schedules as to provide a place for him. This was a judgment matter and according to the evidence, involved financial aspects, scheduling problems, classroom space, instructor qualifications, enrollment and other relevant factors. It was a function of the college administration and, in the absence of bad faith, arbitrary or capricious action, which the court did not find, the trial court was in error in substituting its judgment for that of the elected college board. (*Morris v. School District*, 139 Kan. 268, 30 P. 2d 1094; and *Board of Education v. Shepherd*, 90 Kan. 628, 135 Pac. 605). Dr. Crouch testified that there was not a position available when Hamann requested reinstatement. Dr. Carl Heinrich, dean of academic affairs, explained how the student load was allocated to various faculty members based upon available staff. He testified that Hamann was primarily involved in teaching biological sciences and secondarily in mathematics; that there was no position available for Mr. Hamann in the area of biological sciences at the time he requested to return; and that in the combined area of mathematics and biological sciences there would not have been a combined position creating a full time load for Hamann without discharging some other faculty member. Heinrich further testified that when enrollment came in "we could see we could handle it under the present staff." We find no evidence that warrants an inference of or implies fraud, arbitrariness or bad faith on the part of the board of trustees or its employees.

The cases cited by *amicus curiae* deal with the "expectancy of

continued employment" under the continuing contract law and the constitutional rights of a teacher under the Civil Rights Act of 1871 (*Endicott v. Van Petten*, 330 F. Supp. 878 [1971]). The cases referred to do not support Hamann here, where whatever his rights to reinstatement might be they are governed by the policy leave regulation. Moreover, Hamann admits he was notified that he was not to be reinstated prior to March 15, 1970; that he was properly represented by Bill Hobbs and the KNEA; and that a hearing—as far as he was concerned—was granted to Bill Hobbs. Hamann makes no claim that he was denied procedural due process, the subject of most of the cases cited by *amicus curiae*.

Under the circumstances related and for the reasons heretofore stated, we hold the appellees were not required to reinstate Hamann to a position on the faculty and it follows that he was not entitled to damages.

The judgment is reversed with directions to enter judgment for appellees.