**CENTRON DPL COMPANY, INC.,**
**a Minnesota corporation,**
**Appellant,**

**v.**

**TILDEN FINANCIAL CORPORATION,**
**a New York corporation, Appellee.**

**No. 91–1560.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 11, 1991.

Decided June 3, 1992.

Patrick J. McLaughlin, Minneapolis, Minn., argued (Rebecca E. Bender, on the brief), for appellant.

William G. Cottrell, Minneapolis, Minn., argued (Daniel P. Ofstedal, on the brief), for appellee.

Before LAY,* Chief Judge, ARNOLD,** Circuit Judge, STUART,*** Senior District Judge.

LAY, Chief Judge.

This case involves a contract dispute arising from an equipment lease financing

agreement concerning the amount of money required to prepay a loan. Centron DPL Company ("Centron") claims that the parties agreed to a prepayment of $2,842,-824.25, while Tilden Financial Corporation ("Tilden") contends that the agreement called for a payoff of $2,937,825.25. Centron brought suit for overpayment to recover $95,001 and included a claim for misrepresentation. The district court entered judgment for Tilden on both counts and Centron appeals.

BACKGROUND

The basic facts were stipulated by the parties and need not be recited at length here. It is sufficient to note that Tilden agreed to loan Centron $3,701,315.44 so that Centron could purchase an IBM mainframe computer. Monthly payments of $95,001 were due Tilden on the twentieth day of each month beginning on September 20, 1987. Centron then leased the mainframe to Home Life Insurance Company ("Home Life"), whose monthly lease payments of $95,001 were paid directly to Tilden in satisfaction of Centron's monthly loan payments.

In August of 1988, Centron contacted Tilden to arrange a prepayment of the loan so that it could sell the mainframe to a third party. Rick Soskin, the director of financial services for Centron, spoke to Tilden financial officials Herbert Zaks and Edward Rozins to ascertain the amount of the prepayment. It is clear from the personal notations of both Soskin and Zaks that the two discussed the application of the Rule of 78s, a common method of calculating the prepayment amount on outstanding loans. The two also agreed that no sales tax should be added to the prepayment amount. Confusion arose, however, with regard to whether Tilden's prepayment calculation assumed that the August payment from Home Life had been received. Soskin's notes indicate he believed the payoff figure of $2,937,825.25 was

* The Honorable Donald P. Lay was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 7, 1992, before the opinion was filed.

** The Honorable Richard S. Arnold became Chief Judge of the United States Court of Appeals for the Eighth Circuit on January 7, 1992.

*** The Honorable William C. Stuart, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

predicated on the assumption that Home Life had not yet made its August payment. Soskin faxed a letter to Rozins at Tilden stating this assumption on August 25, 1988. This letter purported to confirm the prepayment agreement reached between Centron and Tilden, and set forth Centron's understanding that if the August payment had been made, only $2,842,824.25 was due Tilden. Soskin's letter sought confirmation of the correct amount from Rozins to be made with Heidi Rigelman, Centron's manager of lease administration. Soskin delegated to Rigelman the responsibility for wiring Tilden the prepayment amount.

According to Rigelman, on the morning of August 26, 1988, Rozins called to discuss Soskin's letter. Rozins told her that Soskin's figure was in error and the payoff amount was $2,937,825.25. Rigelman testified that after performing some quick calculations, she informed Rozins that the $2.9 million figure would be correct if, as stated in Soskin's letter, the August payment had not been received. According to Rigelman, Rozins confirmed that the August payment had not yet been received. Rozins testified that he did not recall this conversation at all. He nevertheless claimed that he could not have confirmed Rigelman's assumption because he had no access to information regarding whether the August payment had been received.[1]

According to Rigelman, she proceeded to run an amortization schedule with Centron's accounting manager and the two determined that the $2.9 million figure was a reasonable payoff amount, assuming the August payment had not been made. The parties agree that Rigelman then arranged and sent a wire transfer of $2,937,825.25 to Tilden per instructions from Rozins.

## DISCUSSION

▪ It is clear from the record that Centron and Tilden each attached different meanings to the $2,937,825.25 Centron sent Tilden on August 26, 1988. When parties attach different meanings to a contract term, a situation best understood as a "mis-understanding", there is technically no meeting of the minds and consequently no contract.

▪ It is well settled, however, that where only one party knows or has reason to know of the different meaning attached by the other, that party is bound by the other party's meaning. E. Allan Farnsworth, *Contracts* 487 (1982); *United States ex rel. Union Bldg. Materials Corp. v. Haas & Haynie Corp.*, 577 F.2d 568, 573 (9th Cir.1978); *Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770, 775 (3d Cir. 1972); *Jet Forwarding v. United States*, 437 F.2d 987, 989, 194 Ct.Cl. 343 (1971); *Perry & Wallis v. United States*, 427 F.2d 722, 725, 192 Ct.Cl. 310 (1970); *Hamann v. Crouch*, 211 Kan. 852, 508 P.2d 968, 974 (1973). Minnesota courts have also recognized this rule. *See Lamb Plumbing & Heating Co. v. Kraus–Anderson of Minneapolis*, 296 N.W.2d 859, 864 (Minn.1980); *Paul W. Abbott, Inc. v. Axel Newman Heating & Plumbing Co.*, 282 Minn. 493, 166 N.W.2d 323, 325 (1969). As articulated by the Restatement Second:

> (2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made
>
> > (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or
> >
> > (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know of the meaning attached by the first party.

*Restatement (Second) of Contracts* § 201(2) (1981). The rationalization for this rule seems to be that "a party who makes a contract knowing of a misunderstanding is sufficiently at fault to justify his being subjected to the other party's understanding." Farnsworth, *Contracts* at 488.

---

**1.** This testimony should be weighed with the evidence relating to Centron's later contact with Rozins. *See infra* note 3.

■ In its findings of fact, the district court simply found that Centron did not overpay Tilden and that Tilden provided Centron an accurate payoff figure.[2] The fact that Tilden received from Centron what it believed it was owed is not the issue. The critical factual determination is whether Tilden knew or had reason to know that Centron believed the payoff price of $2,937,825.25 was based on the assumption that the August payment from Home Life had not been received. One factual finding which will be important to this analysis is whether Tilden's officials either affirmatively confirmed or did not refute Rigelman's assumption that the August payment had not been received.[3]

The district court also found that no misrepresentation was made by Tilden to Centron. Although this is a conclusory finding, we deem it to be amply supported by the evidence. The district court's determination that Tilden received what was actually owed, however, does not relate to the critical issue presented by the parties. In the absence of these critical factual determinations, we must vacate the judgment of the district court and remand for reconsideration with instructions to make more complete factual findings.

Judgment vacated and cause remanded to the district court.

---

**2.** One confusing element of Tilden's payoff calculation is the $7,125.08 in "late charges." The loan agreement required monthly payments to be paid by the twentieth of each month. According to the record, every Home Life payment was paid before the twentieth of the month. The August 1988 payment was actually made on the 8th of August. On this record, it is difficult to understand Tilden's computation of late charges.

**3.** In this regard, we note Rigelman's testimony relating to exhibits 14 and 15. On August 31, 1988, after the wire transfer, Rigelman requested Soskin's secretary, Sherry Robinson, to telephone Tilden's Rozins regarding the August payment. Rigelman's memorandum to Robinson, designated as plaintiff's exhibit 14, reads as follows:

Rick [Soskin] asked me to ask you to follow-up on the August payment with Ed Rozens [sic] at Tilden.

If Home Life paid (actually when Home Life paid) the August pmt to Tilden, Tilden needs to cut Centron a check for this pmt of 95,001.00. His # is (516)484–4600 ext 235. If you have questions, I'll help in any way I can.

In response, Robinson wrote a note to Rigelman, designated as plaintiff's exhibit 15:

[Rozins] has not received it [the August payment] yet. I told him they will need to cut us a check when he does & he said he wants to see it in writing. Send request to Tilden Financial, Attention Herb Zaks, Reference schedule # & account #.

Ed [Rozins] said you should give all the info.