(592 P 2d 117)

No. 49,064

Mary R. Clawson, *Appellant,* v. Chester Garrison and Pauline Garrison, and Substituted Defendants James Borth and Pauline Garrison, Co-Executors under the Last Will and Testament of Otto Borth, Deceased, *Appellees.*

 Opinion filed March 23, 1979. 

*Arthur B. McKinley,* of Sublette, for appellant.

*Jack E. Dalton,* of Mangan, Dalton, Trenkle & Gunderson, of Dodge City, for appellees.

Before REES, P.J., SPENCER and PARKS, JJ.

REES, J.: This is an appeal taken from a trial court grant of an injunction requested by the defendants and denial of an injunction requested by plaintiff. We affirm.

During the protracted period this case has been under advisement, we have not only sought an acceptable command of the evidence, issues and factual background of this litigation, but also the implications of its resolution. We will not undertake an explicit detailed recitation of the evidence, but we will set forth certain facts established by the evidence as well as some observations and conclusions of our own. To the extent the expression of these matters is not orderly, we ask the reader's indulgence. The parties may find limited factual misstatements but we are confident that if such exist they are inconsequential.

Particularly since World War II, the conduct of agribusiness in this state has substantially changed. Increased technological knowledge and capabilities have altered farming practices. Historically the foundation of the agricultural industry in the high plains of western Kansas has been dry land farming. Because of the vagaries of nature, farming in the region is severely affected by area and seasonal variations in rainfall. Water has always been one of the most important natural resources in the region. It is a dear commodity. In relatively recent times, consistent and increased crop production has been sought and achieved through widespread use of commercial fertilizers and underground water. Use of the latter has served two significant purposes. The impact of natural variations in precipitation has been lessened. Except for years of most fortuitous coincidence of weather conditions, controlled and increased surface application of water to crop land has increased its productivity beyond that otherwise possible.

Here we have two parties, operators of adjacent acreages, each of whom we will refer to in the singular, who are affected by the

institution of irrigation practices incident to the use of underground water. Although the land in the area with which we are here concerned is quite level, there was natural drainage for surface water and historical natural drainage was from the plaintiff's property to the defendant's. On the parties' land there were no natural streams along which water ordinarily flowed throughout each year or even in the same season of each year. In its natural state there were so-called lagoons, or dry lake beds, on the property of both parties. When there was sufficient rain to cause a runoff of surface water, the lagoons would fill to their individual capacities and when a lagoon was filled excess surface water would travel along natural depressions to a lagoon or lagoons at lower elevation. If there was sufficient runoff, water would seek still lower locations off of and away from the parties' property. Understandably, the natural drainage was irregular in direction and under appropriate circumstances there was some drainage, or "back-up," of surface water from defendant's property onto plaintiff's property.

Although the parties operated other contiguous acreage, directly involved in this case are three quarter sections lying in a line from north to south operated by plaintiff and one quarter section operated by defendant lying immediately to the east of plaintiff's middle quarter section. At all times material, defendant's land has been committed to dry land farming; it is not irrigated. On the other hand, plaintiff has undertaken irrigation of her three quarters. To accomplish this, plaintiff has tinkered with Mother Nature. She has modified natural terrain features by leveling or "shaping." She has drilled and put into operation water wells, one on the north quarter and one on a quarter section adjacent to or near her south quarter, to provide water for irrigation of the three quarters. The effect of the shaping is that surface drainage from the north and south quarters is to the middle quarter and from the middle quarter east to defendant's quarter. The land reshaping and installation of the irrigation system was performed during the years 1966 through 1970 at an approximate cost of $32,200.

Plaintiff's irrigation water is transmitted by pipe from the wellhead to the north side of the north quarter, to the west side of the middle quarter and to the south side of the south quarter. In substantial accord with good water management practice, the

plaintiff excavated a tailwater pit at the extreme east side of the middle quarter. The tailwater pit provides a retention capability for irrigation water that is not absorbed into the ground as it flows over the surface. The grading and shaping of the north quarter was such that irrigation water reaching its south side travels to a location at approximately the southeast corner of the quarter and then by ditch along the east property line it travels south to the tailwater pit. The middle quarter was shaped such that irrigation water reaching its east side travels by ditch to the south or north to the tailwater pit. The south quarter was shaped such that irrigation water reaching the north side travels east or west to a culvert where it passes through to the north side of the south line of the middle quarter and then by ditch to the southeast corner of the middle quarter and finally by ditch north to the tailwater pit. By means of a pump at the tailwater pit and pipe laid for the purpose, accumulated water at the tailwater pit is returned to the distant side of one or more of the three quarters where it is again released to pass through the crop acreage. The obvious purpose of the tailwater pit system is reuse of once-pumped underground water so that it does not go to waste because it is not absorbed when passing across the crop acreage. The entire system would function without complication if it were not for consideration of surface water resulting from precipitation and if the operation of the system is overseen and managed so that the tailwater pit is not allowed to overflow. As to surface water resulting from precipitation, the retention capability of the tailwater pit is dependent upon the amount of irrigation water accumulated or allowed to accumulate in the pit and whether the tailwater pit recovery system is in operation, on pump. By way of explanation, if the tailwater pit is filled to capacity with irrigation water, then there is no rainwater retention capability; if there is no irrigation water in the pit, the entire capacity of the pit is available for retention of rainwater; and if the tailwater pit is on pump, the rainwater retention capability has a correlation to the rate of transmittal of water back through the recovery system.

At this juncture we will refer again to the lagoons. They were dry in their natural state. They were regularly planted as the land immediately adjacent was planted; that is, if the immediately adjacent acres lay fallow, they lay fallow; but if the immediately adjacent acres were put to crop, the lagoons were put to crop. As a

practical matter, the lagoons simply were shallow depressions in the otherwise almost flat surface. Accumulated surface water remained in the lagoons until lost through evaporation and absorption. The land shaping by the plaintiff eliminated the lagoons on her three quarters. Thus the surface water retention capability of the lagoons on plaintiff's land was lost by plaintiff's conversion to irrigated farming. Specifically, essentially uncontradicted trial evidence established that plaintiff's land shaping eliminated one lagoon on the south quarter that had a capacity of forty-four acre-feet of water and one lagoon on the middle quarter that had a capacity of ten acre-feet of water. (Somehow during trial and without objection, the total of these two capacities was considered by the parties and the trial court to be fifty-five acre-feet and we will perpetuate this arithmetic error.) To the extent of its available capacity, the tailwater pit replaced the lost retention capability of these two lagoons.

The average annual rainfall in the area of the parties' property is on the order of 19.5 inches, the equivalent of 260 acre-feet of water per quarter section. Thus the obliteration of the mentioned lagoons resulted in a lost water retention capacity equivalent to approximately 21.2% of the average annual rainfall on one quarter, approximately 10.5% for two quarters, and approximately 7.1% for three quarters. But these percentages, creatures of our own computations, are of materiality only to provide some concept of the extent of loss of water retention capability. Obviously the amount of rain received in a given time is the most important factor in determining the extent of surface water and surface runoff. In the case before us, there was injected through the evidence various additional factors including, among others, porosity of cultivated ground as opposed to uncultivated ground and soil absorption rates and capacity as affected by the degree of irrigation immediately preceding or concurrent to rainfall.

Prior to the shaping of plaintiff's three quarters, plaintiff's surface water runoff occurred in various degrees and at various locations on the property lines of defendant's quarter. As a part of the land shaping by plaintiff, an elevated access road was built on plaintiff's land next to the east property line of plaintiff's middle quarter. The elevation of this road was higher than the preexisting natural elevation of that east property line. The road acted as a dike that both obstructed natural surface water drainage onto

defendant's quarter and served as the east side of the tailwater pit. During construction of the road, two eighteen inch culverts were placed through the road base but their elevation was not determined upon installation and is not now known.

1972 and 1973 were years of abnormally high rainfall in the area. In September, 1973, when there was relatively heavy rain, defendant engaged in self-help; he threw up an earth dike on his land parallel to and immediately adjacent to plaintiff's access road. The top of the dike was at an unknown elevation above the surface of the access road. The dike blocked drainage from the tailwater pit onto defendant's quarter. It caused water to back up and stand in the crops on plaintiff's land.

Of the foregoing, we find the primary factual conclusion established by the evidence is that there was an elimination of a fifty-five acre-feet surface water retention capability by reason of plaintiff's modification of the topography of her three quarters. Excluding the effect of the tailwater pit and possibly altered soil porosity of the tilled acreage, after plaintiff's shaping of her three quarters and upon proper coincidence of rainfall and time, an additional fifty-five acre-feet of surface water drains onto defendant's quarter. With this understanding, we direct attention to other facts involved.

Plaintiff commenced this action on September 14, 1973, by filing a petition alleging defendant had created a structure which obstructed and diverted the natural flow of surface water and caused water to be retained on plaintiff's land. Plaintiff sought damages and a mandatory injunction requiring defendant to remove his dike. An immediately issued temporary restraining order required defendant to remove his dike. On September 17, and apparently by agreement of the parties, the restraining order was lifted and the matter was set for further hearing the next month. Defendant cut his dike and water drained off plaintiff's land onto defendant's. In October, and again by agreement of the parties, further proceedings were held in abeyance to permit the parties to attempt a voluntary and mutually acceptable resolution of this matter. The parties failed to reach such a resolution. The case was pretried in March, 1975, and defendant lodged a counterclaim by which he sought damages and a mandatory injunction requiring plaintiff to recreate and maintain a surface water retention capability. At trial, both plaintiff and defendant abandoned

their damage claims and, as noted, plaintiff's mandatory injunction request was denied and defendant's mandatory injunction request was granted. The particular form and nature of the terms of the injunction will be briefly mentioned later.

Couched in somewhat different language, the testimony of plaintiff's husband and her tenants clearly reflects that with respect to defendant's requested injunction they personally believed they had various factual defenses. Hopefully omitting none they believed substantial, we will state those we have perceived from our review of the record. There is surface water drainage onto plaintiff's land from adjacent tracts owned and operated by others. Tillage and irrigation results in greater soil penetration by surface water than would occur if the ground was not planted, cultivated and irrigated with the consequence being that the fifty-five acre-feet water retention loss is to some degree offset. The surface water retention capability of the tailwater pit at least partially offsets the retention loss. The tailwater pit capacity had been increased by further excavation since the filing of the lawsuit; further increase of its capacity by additional excavation is planned; and if it is not now true, the final expected capacity of the tailwater pit will equal or exceed fifty-five acre-feet. The shaping of the south quarter was done in accord with one of multiple irrigation development plans reviewed by the local soil conservation service office. Recently constructed tailwater pits on upper adjacent tracts will decrease if not eliminate surface water runoff originating from those neighboring lands.

Lastly, mention need be made of the activity of the parties during the almost sixteen month period from the date suit was filed to the date of pretrial. Surveys were made of both immediately involved and nearby property. A hydrologist, a conceded expert, studied the survey and other data and prepared a retention structure plan, the cost of which if implemented in 1976 would have been somewhat less than $3,000. In the course of the hydrologist's work and also in the course of the county engineer's work, they each arrived at a conclusion as to an elevation at which the east line of plaintiff's middle quarter should be maintained in order to provide an additional, or replacement, fifty-five acre-feet water retention capability on the plaintiff's middle quarter. The substance of the trial court judgment from which this appeal is taken is that defendant is entitled to maintain a dike to that

computed elevation and that plaintiff is directed to restore water storage capacity to that computed elevation.

Plaintiff raises multiple issues on appeal. To consider these we first note applicable underlying law. Surface water under the common law was a common enemy which a landowner could fight as he deemed best. He could obstruct or divert its flow without regard to resulting damages to other landowners. However, statutory forerunners of K.S.A. 24-105 and 24-106 enacted in 1911 were substituted for the common law and landowners lost the right to deal with surface water in any manner they chose. *Goering v. Schrag,* 167 Kan. 499, 500, 207 P.2d 391 (1949); *Dyer v. Stahlhut,* 147 Kan. 767, 770, 78 P.2d 900 (1938).

The trial court found the plaintiff's acts constituted a violation of K.S.A. 24-105. That statute provides in relevant part as follows:

"It shall be unlawful for a landowner or proprietor to construct or maintain a dam or levee which has the effect of obstructing or collecting and discharging with increased force and volume the flow of surface water to the damage of the adjacent owner or proprietor . . . ."

Plaintiff contends the trial court erred in rendering injunctive relief for defendant where defendant dismissed his claim for damages and failed to present evidence of damage or the threat of damage. Plaintiff argues that the facts of the case did not warrant the drastic relief of mandatory injunction and that defendant could have been compensated for any damages in an action at law.

The Kansas Supreme Court has affirmed the use of injunctive relief to correct a violation of K.S.A. 24-105. *Rardin v. Marcotte,* 194 Kan. 186, 189, 398 P.2d 351 (1965); *Simon v. Neises,* 193 Kan. 343, 347, 395 P.2d 308 (1964); *Bolinger v. Moorhouse,* 154 Kan. 124, 114 P.2d 853 (1941).

However, plaintiff argues defendant suffered no damage from the increased runoff caused by the leveling of plaintiff's land. This argument is made with the observation that K.S.A. 24-105 makes unlawful only the diversion of surface water "to the damage of the adjacent owner."

Injunctive relief is not used to prevent prospective injury unless it appears there is a reasonable probability of injury and an action at law will not afford an adequate remedy. *Freeman v. Scherer,* 97 Kan. 184, 188, 154 Pac. 1019 (1916). Mere apprehension or a possibility of wrong and injury ordinarily is not enough

to warrant the granting of an injunction. *Hurd v. Railway Co.,* 73 Kan. 83, Syl. ¶ 3, 84 Pac. 553 (1906). To establish a right to an injunction it is necessary for a party to satisfy the court there are reasonable grounds to fear the recurrence of the new injury with such frequency as seriously to affect the value of his lands, or that other considerations render his remedy at law inadequate. *Whitehair v. Brown,* 80 Kan. 297, 300, 102 Pac. 783 (1909).

A review of the record in the present case indicates that there is some circumstantial evidence but little direct evidence of damage to defendant's land. It is true that defendant did not testify and there was no evidence of crop loss. However, we are satisfied the evidence indicates plaintiff's actions in leveling her land and in constructing the elevated access road with two culverts had the effect of accelerating and increasing the flow of surface waters onto defendant's land. A tenant who farmed nearby land testified that in 1973 there was more water on defendant's land than he had ever seen before. The parties stipulated defendant's land was used for dry land farming. The trial court made a personal inspection of the site and made the following conclusion:

"(2) That the plaintiff diverted by artificial means, surface waters on her lands onto the land of a lower proprietor and accelerated and increased the flow of surface waters and increased the drainage of her own land to the damage of the defendants."

The grant or denial of a mandatory injunction rests within the discretion of the trial court and should be disturbed only upon the showing of abuse. 42 Am. Jur. 2d, Injunctions § 353, p. 1162.

Although the evidence of damage or prospective injury was scanty and defendant dismissed his counterclaim for damages after the evidence was presented, the evidence here is sufficient to bring this case within the ambit of K.S.A. 24-105 and the case law upholding the use of injunctive relief, particularly in view of the discretionary power of the trial court. *Goering v. Schrag,* 167 Kan. 499; *Horn v. Seeger,* 167 Kan. 532, 207 P.2d 953 (1949); *Skinner v. Wolf,* 126 Kan. 158, 266 Pac. 926 (1928); *Martin v. Lown,* 111 Kan. 752, 208 Pac. 565 (1922); *Evans v. Diehl,* 102 Kan. 728, 172 Pac. 17 (1918).

Plaintiff next contends defendant's counterclaim for injunctive relief was barred by the statute of limitations. She argues the land leveling was a completed permanent improvement and that the statute of limitations expired two years later. Defendant counters

with the argument that the damage done to his property in 1973 from the flow of surface water off of plaintiff's land was a temporary injury and each such injury causes a new cause of action to accrue. Defendant contends the effects of plaintiff's land leveling were subtle and not discernible until the heavy rain of 1973.

The trial court neglected to rule upon the statute of limitations question in its written findings of fact and conclusions of law. However, in its oral rulings at the conclusion of the hearing upon plaintiff's motion for additional findings of fact, the trial court indicated its position was contrary to that of plaintiff.

This court has recently had occasion to consider when a cause of action accrues as the result of a party causing another's land to be flooded by diverting surface water from its natural course of flow. In *Dougan v. Rossville Drainage District,* 2 Kan. App. 2d 125, 575 P.2d 1316, *rev. denied* 224 Kan. clxxxvii (1978), it is initially noted:

"The question of when a cause of action accrues as a result of a party causing another's land to be flooded has been extensively litigated in Kansas. Not all of the Kansas authority is in harmony. Obviously, each case must be decided on its own facts, giving due regard to established law." (p. 127.)

and Kansas case law is reviewed as follows:

"The Kansas Supreme Court has considered whether the injury was permanent or temporary as the determinative factor in when the statute of limitations commences to run against damage from flooding caused by construction. In *Henderson v. Talbott,* 175 Kan. 615, 621, 266 P.2d 273, the Supreme Court approved language from 56 Am. Jur., Waters §§ 45 and 443 (now 78 Am. Jur. 2d, Waters §§ 35, 39, 122, 123, 128 and 367) to the effect that if an injury is permanent, or if the causative structure or condition is of such a character that injury will inevitably result, *and the amount of damages* can·be determined or estimated, a single action for both past and future damages should be brought. *Henderson* adopts a rule which would allow as many successive recoveries as there are successive injuries, where the construction or continued existence of the structure is not necessarily injurious, but may or may not be so, or where the flooding is merely temporary, occasional or recurrent, causing no permanent injury to the land. Successive recovery was also approved where the possibility or likelihood of the alteration or abatement of the causative condition existed. The statute of limitations starts to run when plaintiff's land or crops are harmed and each injury by flooding brings a new cause of action until the injury becomes permanent. (*Simon v. Neises,* 193 Kan. 343, 348, 395 P.2d 308.)" (p. 128.)

In reversing the trial court, it was concluded that plaintiff's damages were temporary and therefore his cause of action did not

accrue and the statute of limitations did not begin to run until the time of a second flood in October, 1973. It was observed that plaintiff's land had been flooded only twice in the last twenty-four years; that following a 1967 flood plaintiff's permanent damages were not reasonably capable of judicial ascertainment; that flooding of plaintiff's land was contingent upon a number of events occurring at approximately the same time; and it would have been highly speculative to determine when and if such combination of events would occur again. In *Dougan,* as in the present case, the applicable statute of limitations was K.S.A. 60-513(*a*)(4).

The Supreme Court was confronted with a similar case in *Gowing v. McCandless,* 219 Kan. 140, 547 P.2d 338 (1976). There a ditch which carried water from plaintiffs' land across defendants' land was obstructed in 1965 when defendants filled it with trees and dirt. The obstruction caused water to back up onto plaintiffs' land. Plaintiffs did not file suit until 1972. Even though there was substantial evidence that plaintiffs were aware of the obstruction and resulting damage to their property many years before filing suit, the Supreme Court upheld the trial court's determination that the plaintiffs' injuries were temporary and a cause of action accrued with each new flooding. The court described temporary injury as follows:

"Injuries have been classified as temporary or recurring in nature when caused by an abatable nuisance or condition, or by defects which can be repaired or remedied at reasonable expense. Successive injuries of this nature have been held to give rise to separate and distinct causes of action." (Syl. ¶ 2.)

We find *Dougan* and *Gowing* applicable. Here there is evidence that no substantial flooding and injury occurred on defendant's property as a result of plaintiff's land leveling until 1973. Flooding is an infrequent and virtually unpredictable occurrence. The amount of both present and future damages to defendant could not reasonably be determined in a single action.

Plaintiff next claims the doctrine of equitable estoppel should bar defendant's counterclaim. She says defendant, by silence and inaction, permitted her to make permanent improvements and expend large sums of money over a period of several years. Defendant, according to plaintiff, sat back, without asserting the rights he now claims to have been violated, and permitted plaintiff to prejudicially change her position.

Plaintiff confuses the doctrines of equitable estoppel and laches. The cases relied upon by plaintiff concern laches and not equitable estoppel.

"The doctrine of equitable estoppel is based upon the principle that a person is held to a representation made or a position assumed when otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances, has in good faith relied thereon. (*Maurer v. J. C. Nichols Co.*, 207 Kan. 315, 485 P.2d 174 [1971].)

"This court has further said:

" 'The doctrine of equitable estoppel requires consistency of conduct, and a litigant is estopped and precluded from maintaining an attitude with reference to a transaction involved wholly inconsistent with his previous acts and business connection with such transaction.' (*Browning v. Lefevre*, 191 Kan. 397, Syl. ¶ 2, 381 P.2d 524 [1963].)

" '. . . One who asserts an estoppel must show some change in position in reliance on the adversary's misleading statement. . . .'' (*In re Morgan*, 219 Kan. 136, 137, 546 P.2d 1394 [1976].)

" '. . . Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. . . .' (*United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 527, 561 P.2d 792 [1977].)" *Bowen v. Westerhaus*, 224 Kan. 42, 45-46, 578 P.2d 1102 (1978).

In the present case, it does not appear that defendant made false representations or concealed facts from the plaintiff and, therefore, equitable estoppel is not applicable.

Laches is principally a question of inequity of permitting a claim to be enforced; an inequity founded upon some change in the condition or relations of the property or parties. It is delay that makes it inequitable to afford the relief sought and warrants the presumption that a party has waived his right. Laches is an equitable device to bar legal claims in certain instances. *Perpetual Royalty Corporation v. Kipfer*, 253 F. Supp. 571 (D. Kan. 1965). It is an equitable device designed to bar stale claims and courts of equity will regard long passage of time in asserting claims with disfavor apart from any particular statute of limitations. *Clark v. Chipman*, 212 Kan. 259, 510 P.2d 1257 (1973); *McFadden v. McFadden*, 187 Kan. 398, 357 P.2d 751 (1960).

Laches is not properly applicable in the present case. Plaintiff's argument proceeds upon the assumption that defendant was

aware of the damaging effect plaintiff's land leveling would have upon his property at the time the land was leveled and the access road constructed. As noted, there was evidence plaintiff's actions did not result in flooding upon defendant's property until 1973. Plaintiff refers to nothing in the record indicating that defendant was aware of damage or threat of damage to his property prior to 1973. The cases relied upon by plaintiff are distinguishable in that they involve a failure by the plaintiff to promptly assert his rights after the plaintiff knew or should have known that his rights were infringed. In the present case, plaintiff has not shown that defendant slumbered upon his rights with knowledge of those rights.

Plaintiff next asserts the trial court erred in not finding her land leveling was in conformance with regulations of the United States Department of Agriculture and the Kansas Division of Water Resources. Unfortunately, plaintiff does not provide in her brief a citation for the alleged administrative standard. Defendant in his brief on appeal makes no attempt to answer plaintiff's argument. We do not find such a standard in our review of the administrative regulations of the Division of Water Resources found in Chapter 98 of the Kansas Administrative Regulations.

Even assuming state and federal agencies have created a standard for water retention in the development of irrigation plans, plaintiff cites no authority that such standard is controlling as to one landowner's liability to an adjacent landowner for runoff resulting from land leveling. A review of the statutes (K.S.A. 74-506a *et seq.*) and the administrative regulations (K.A.R. ch. 98) indicates that the state division of water resources, within the state board of agriculture, is an agency upon which the powers and authority of the old Kansas water commission and state division of irrigation have been conferred. K.S.A. 74-506b. It remains the duty of the irrigation commissioner to gather data, information and statistics concerning the state's water supply and the methods employed in applying water to crops. K.S.A. 74-509. The commission is also to provide assistance and advice to any individual interested in installing an irrigation plant. The division of water resources also supplies state assistance in the construction of water development projects. A water resources board holds hearings upon applications for state assistance and makes determinations of eligibility. K.A.R. 98-2-10. We find

nothing in the statutes or regulations to support plaintiff's contention that administrative regulations created by the division of water resources govern the legal liability of landowners for runoff caused by land leveling.

K.S.A. 24-105 specifically declares it unlawful "for a landowner or proprietor to construct or maintain a dam or levee which has the effect of obstructing or collecting and discharging with increased force and volume the flow of surface water to the damage of the adjacent owner or proprietor." The statute does not define an acceptable level of discharge. Plaintiff's land leveling in conjunction with the elevated access road with culverts appears to constitute a violation of the statute whatever may be the administrative regulations of the division of water resources or the United States Department of Agriculture.

One of the trial court's conclusions of law was as follows:

"(3) That the defendants have the right to maintain a dike to the elevation of 98.30 feet, and any prior restraining orders or injunctions issued herein contrary to this should be and the same are hereby so amended."

Thus, the trial court affirmed its earlier lifting of the temporary restraining order that required defendant to remove his dike. Plaintiff contends the trial court erred in this finding and in not granting plaintiff a mandatory injunction requiring defendant to remove his dike permanently. Plaintiff argues the defendant's dike is a violation of K.S.A. 24-105 and mandatory injunction to compel defendant to remove it is a proper remedy.

There is a certain inconsistency between plaintiff's argument here and her argument that the trial court erred in granting injunctive relief to defendant. The refusal of the trial court to issue a mandatory injunction ordering defendant to remove his dike was not erroneous. A mandatory injunction is an extraordinary remedial process usually resorted to for the purpose of effectuating full and complete justice, and commands the performance of some positive act. While the granting of mandatory injunctions is governed by the same rules as the granting of preventive injunctions, courts are more reluctant to grant a mandatory injunction than a prohibitory one, and generally an injunction will not lie except in prohibitory form. A party seeking a mandatory injunction must clearly be entitled to such relief before it will be rendered. *Prophet v. Builders, Inc.,* 204 Kan. 268, 273, 462 P.2d 122 (1969). The grant or denial of mandatory

injunctive relief rests within the sound discretion of the trial court and should be disturbed only upon the showing of abuse. 42 Am. Jur. 2d, Injunctions § 353, p. 1162.

Plaintiff is not in a position to seek equitable relief in the form of a mandatory injunction. In *Freeman v. Scherer,* 97 Kan. 184, the Supreme Court affirmed a trial court's refusal to grant a mandatory injunction where it appeared the plaintiff landowner had caused flooding upon his own property by erecting an obstruction in the defendant's drainage ditch. The Court said in part:

"One who asks for an injunction is governed by the usual equitable rules, and one of them is that 'He who seeks equity must do equity.' If he has acted wrongfully and illegally in the matter he is hardly entitled to ask for equitable relief by injunction. He did act illegally and wrongfully when he closed the ditch and obstructed the passage of water through it. In a sense he invited and permitted the injury which he anticipates may result to him from the ditch and dike. 'A party can not invite and encourage a wrong, and then ask a court of equity to protect him by an injunction from the consequences of that wrong.' (*Stewart v. Comm'rs of Wyandotte Co.,* 45 Kan. 708, syl. ¶ 2, 26 Pac. 683; *Downs v. Comm'rs of Wyandotte Co.,* 48 Kan. 640, 29 Pac. 1077, 22 Cyc. 776.)" (p. 189.)

In the present case it appears plaintiff invited and precipitated the injury upon her own property. It was her action in leveling her land and establishing the elevated access road with culverts which precipitated defendant's retaliatory action. Plaintiff has not done equity and therefore is not entitled to equity.

In *Dyer v. Stahlhut,* 147 Kan. 767, the plaintiff landowner caused surface water to drain onto defendant's property by removing a hedge row and lowering the property line elevation. Defendant's response was to fill the depression caused by the removal and restore the ground elevation. Plaintiff brought an action to obtain a mandatory injunction for the removal of the dirt placed at the property line by defendant. The trial court denied the relief sought and the Supreme Court affirmed. *Dyer* is distinguishable because of its particular finding that the filling in of the hedge row with dirt did not constitute a dam or levee within the meaning of the statutory forerunner of K.S.A. 24-105. Further, it was plaintiff who had created the artificial means of surface water diversion. 147 Kan. at 771.

A case upon which plaintiff relies, *Skinner v. Wolf,* 126 Kan. 158, is also distinguishable. There the plaintiff landowner brought suit for a mandatory injunction requiring defendant to

remove a dike which obstructed the flow of surface water from plaintiff's land across defendant's land. The trial court granted the injunction and the Supreme Court affirmed. *Skinner* differs from the present case in that there it was found plaintiff was not responsible for the diversion of the flow of surface and drainage waters across defendant's land. Here defendant's dike was constructed in response to actions taken by plaintiff that diverted surface water onto defendant's land.

As her final issue, plaintiff asserts that the trial court made a finding of fact that leveling land for irrigation is tantamount to the construction or maintenance of a dam or levee. Plaintiff contends there is no evidence or case law supporting the view that land leveling is equivalent to the construction and maintenance of a dam or levee in violation of K.S.A. 24-105.

Plaintiff ignores the fact that in addition to her land leveling an elevated road was constructed which served to impound waters upon her property. When two culverts were placed in the road the water was then permitted to escape at an increased velocity across defendant's land. The court recognized the effect of the elevated road and the culverts in the following finding:

"(7) Plaintiff also constructed an elevated road between the SE/4 of Section [16] and the SW/4 of section 15. The effect of the road was to impound waters, irrigation and rainfall runoff upon section 16, however the plaintiff subsequently placed two 18″ culverts through the road for the passage of waters. There was no attempt to make any determination of the relative elevations of the culverts or the effect of the discharge of water or the amounts thereof through such culverts upon the defendants."

The elevated access road may fairly be considered to be a dam or levee obstructing, collecting or discharging with increased force surface water as contemplated by K.S.A. 24-105. See *Simon v. Neises,* 193 Kan. 343. Even if plaintiff's elevated access road should not be termed a dam or levee, the rule in Kansas now is that as to agricultural lands outside the incorporated limits of a city, upper proprietors may not divert their surface waters by artificial means onto the lands of lower proprietors nor accelerate by means of ditches or increase the drainage of their lands to the injury of lower owners. *Goering v. Schrag,* 167 Kan. at 501.

We can see the possibility of future differences between these parties. There will be dry times. Injunctions are subject to modification. But we are concerned only with the issues now before us. It appears that the parties' interests would be best served by a

voluntary mutual accommodation. They are in a better position than the courts to effect practical resolution.

Affirmed.