**MID–AMERICA PIPELINE COMPANY, Plaintiff,**

v.

**LARIO ENTERPRISES, INC. and the City of Topeka, Kansas, Defendants.**

No. 88–4205–S.

United States District Court, D. Kansas.

June 2, 1989.

James L. Grimes, Jr., Cosgrove, Webb & Oman, Topeka, Kan., Kristen E. Cook, Mid–America Pipeline Co., Tulsa, Okl., and Leonard J. Johnson and David C. Stout,

Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for plaintiff.

Donald D. Barry, Donald D. Barry, Chtd., and Gerald L. Goodell, Goodell, Stratton, Edmonds & Palmer, Topeka, Kan., for Mid–America Pipeline Co.

Edwin P. Carpenter and Stephen P. Weir, Carpenter, Weir & Myers, Chtd., Topeka, Kan., for City of Topeka.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This case is now before the court upon plaintiff's prayer for a permanent injunction against the further construction and operation of Heartland Park Topeka (HPT), a motor sports racing facility being constructed over pipelines operated by plaintiff. After a hearing upon a preliminary injunction motion, which the court denied, the parties agreed, pursuant to FED.R. CIV.P. 65(a)(2), that the court could consider the evidence presented at the hearing upon the preliminary injunction motion, together with final argument at a subsequent hearing, to determine whether to grant a permanent injunction.

Plaintiff is Mid–America Pipeline Company. Defendants are Lario Enterprises, Inc. ("Lario") and the City of Topeka, Kansas. After considering all the material before the court, the court shall deny plaintiff's prayer for a permanent injunction on the following grounds: plaintiff has an adequate remedy in condemnation or damages; an injunction would place an unfair hardship upon defendants; and, an injunction would not be in the interests of the public. These conclusions are founded upon the following findings of fact and conclusions of law.

1. There is no dispute as to this court's jurisdiction over this case under 28 U.S.C. § 1332, the diversity of citizenship statute.

2. Plaintiff is an interstate common carrier of natural gas liquids. Plaintiff has two pipelines buried at HPT. One of the pipelines was built in 1960. The other was built in 1971. The pipelines were buried at a depth of 30 to 48 inches. The pipelines carry propane and ethane, in liquid form.

3. These pipelines were laid pursuant to easements purchased by plaintiff from Alice E. Boley and Mary E. Zeidler in 1960. The easements provide:

"Grantor (whether one or more) do hereby grant, bargain, sell and convey unto Mid–America Pipeline Company, a Delaware Corporation, its successors and assigns, hereinafter referred to as 'Grantee', the right, privilege and easement, at any time and from time to time to construct, maintain, inspect, operate, protect, repair, replace, change the size of, or remove a pipeline or pipelines, gate valves and other appurtenances, including cathodic protection equipment, within the confines of a right of way Sixty feet in width, said right of way being Twenty feet on the North/West side and Forty feet on the South/East side of a line (to be) (as) surveyed and definitely established by the center line of the initial pipeline constructed for transportation of natural gas, oil, petroleum products or any other liquids, gases or substances which can be transported through a pipeline, together with the right of ingress and egress to and from the same for the purposes aforesaid, over, under, through and across the following described lands, of which the Grantor warrants they are the owners in fee simple, situated in the County of Shawnee, State of Kansas, to wit:

(Legal Description omitted)

TO HAVE AND TO HOLD said right of way and easement unto said Grantee, its successors and assigns forever.

It is agreed that the pipeline or pipelines to be laid under this grant shall be constructed at sufficient depth below the surface of the ground to permit normal cultivations, and Grantor shall have the right to fully use and enjoy the above described premises subject to the rights herein granted. Grantee shall have the right to clear and keep clear all trees, undergrowth and other obstructions from the herein granted right of way, and Grantor agrees not to build, construct or create, nor permit others to

build, construct or create any buildings or other structures on the herein granted right of way that will interfere with the normal operation and maintenance of the said line or lines. Grantee agrees to pay to the then owners and to any tenant, as their interests may be, any and all damages to crops, timber, fences, drain tile, or other improvements on said premises that may arise from the exercise of the rights hereby granted, said damages, if not mutually agreed upon, to be ascertained and determined by three disinterested persons, one of whom to be appointed by the Grantor, one by the Grantee, and the third by the two so appointed, and the written award of such three persons shall be final and conclusive. Any payment due hereunder may be made direct to the said Grantor or any one of them."

4. Plaintiff drew the easement language.

5. When the easements were purchased, the property was used to grow crops or as pasture. The path of the pipelines was selected by plaintiff to avoid developed property.

6. Plaintiff's officers became aware of the plans for HPT in the summer of 1988. Plaintiff promptly warned defendants of plaintiff's easement rights and objected to the planned construction.

7. Plaintiff filed the instant lawsuit against defendant Lario on August 31, 1988.

8. In October 1988, title to the property below the asphalt tracks was deeded from Lario to the City of Topeka. The City was joined as a defendant in this case shortly thereafter.

9. Currently, four racetrack surfaces approximately 36 feet in width cross over the pipelines. A drag strip approximately 60 feet in width also crosses the pipelines. These surfaces are composed of 7½ inches of asphalt over a 12 inch fly ash/clay base. The base is a mixture of materials designed to set up like concrete. The depth of the cover has been increased over the pipelines in some areas by as much as 12 to 20 feet. It is anticipated that moveable concrete barriers weighing approximately 8,000 pounds apiece shall border the racetrack. Two chain link fences will cross the pipelines in four locations. Additionally, two tram roadways that will also cross the pipelines are contemplated in the future. Spectator seating is not located on the easement property. Indeed, through the use of visual screens on fences, people will be encouraged not to watch races from the easement property. Grandstands and spectator berms are several hundred feet from the pipelines.

10. No pipeline leak or safety problem has developed at the HPT site in the pipelines' history. Recently, however, an explosion caused by a leak from the pipelines occurred at U.S. Highway 75, near HPT. The pipelines at HPT were excavated and inspected in the fall of 1988 after the explosion. No safety problem was detected. The pipelines satisfy federal safety regulations. The construction at HPT will not materially increase the safety risk from the pipelines. The additional asphalt surface hampers plaintiff's biweekly aerial surveillance of the pipelines and interferes with close-interval surveys. These are some of the methods used to guard against leaks or detect leaks in pipelines. Aerial surveillance may spot dead vegetation which could indicate even a small or pin-size leak in the pipelines. Close-interval surveys are conducted across spans of the pipelines at intervals of a few feet to determine the corrosion protection of pipelines. Pipelines may be walked to find signs of small leaks. The pipelines are also computer monitored for major leaks every ten seconds. Asphalt and other obstructions to surveillance exist in hundreds of places in plaintiff's pipeline system. The undisputed testimony from knowledgeable witnesses in this case is that the pipelines are safe and that the racetrack construction will not make them unsafe.

11. If excavation of the pipelines is required in the future, it will be more difficult, time-consuming and expensive to excavate the pipelines now covered by asphalt at HPT. This is because of the asphalt, the fly ash/clay base, and the fill dirt on top of

the pipelines. It is unknown whether excavation will be required in the future. Before October 1988, the pipelines had not been excavated. So, the probability of pipeline excavation appears remote.

12. Additional construction of fences and other items, such as utility or sewer lines, may require additional digging near the pipelines. Although excavation activities near pipelines constitute a danger, the pipelines are well-marked at HPT, and there has been no proof of a substantial or unreasonable danger from future construction or excavation work.

13. HPT is being developed through a development and management agreement between defendants Lario and the City of Topeka. Lario initially purchased the real property for the project. The City passed an ordinance to acquire real estate of the project and pay for the design, purchase, equipping, construction and installation of the buildings, improvements, machinery and equipment at the site. Lario is to manage, operate and maintain the project. The City of Topeka issued general obligation bonds to raise $7.5 million for the project. Lario is investing a similar sum in the project. The City will retain title to the property for HPT for 23 years. Thereafter, the property will revert to Lario, but the City will acquire the right to 1% of the gross receipts of HPT for 27 years. HPT is scheduled to begin operation in August 1989. It is being built to accommodate 75,000 spectators.

■ 14. The asphalt tracks of HPT are "structures which interfere with the normal operation and maintenance of the [pipe]lines" and, therefore, violate plaintiff's easement rights. "Structures which interfere with the normal operation and maintenance of the [pipe]lines" is an ambiguous term. It is capable of differing, but reasonable, constructions. See *Kennedy & Mitchell, Inc. v. Anadarko Production Co.*, 243 Kan. 130, 754 P.2d 803 (1988) (definition of ambiguity). Therefore, the court should seek the intent of the parties at the time the easements were executed to determine what the language means. See *Dorchester Exploration, Inc. v. Sunflower*

*Electric Cooperative, Inc.*, 504 F.Supp. 926 (D.Kan.1980). There is no parol evidence of the intent of the grantors. Nor has there been testimony from officers of the grantee at the time in question. But, it is reasonable to assume that the grantee intended to bar asphalt surfaces from crossing the easements because plaintiff plotted the pipelines to avoid developed property. It is also reasonable to assume that the grantors did not have a contrary intent, since the property was used for pasture and agriculture for decades before and after the easements were executed. This construction conforms with the dictionary definition of "structure." WEBSTER'S NEW COLLEGIATE DICTIONARY 1154–55 (1975). It also conforms with the judicial construction of the term in similar cases: E.g., *Northern Utilities v. City of South Portland*, 536 A.2d 1116 (Me.1988) (sidewalk is a structure which would violate a natural gas pipeline easement). "Structure" is also narrowly defined in other cases. E.g., *Vinyard v. St. Louis County*, 399 S.W.2d 99 (Mo.1966) (building restrictions barring structures other than single family residences did not bar driveway for access to apartments built on adjacent property). We choose a broader definition in this instance for reasons summarized by the Texas Supreme Court in *Stewart v. Welsh*, 142 Tex. 314, 178 S.W.2d 506, 508 (1944), where a fence over a utility easement was ordered removed:

> The word "structure" is often used in a broad sense, often in a restricted sense. The broad definition is that quoted in *Favro v. State*, 39 Tex.Cr.R. 452, 46 S.W. 932, 73 Am.St.Rep. 950: "Any production or piece of work artificially built up, or composed of parts joined together in some definite manner; any construction." In a restricted sense "structure" means: "A building of any kind, chiefly a building of some size or of magnificence; an edifice". 60 C.J. 666.
>
> An ordinary fence is a structure within the broad definition, but is not a structure as narrowly last defined. Many definitions of this word appear in Words & Phrases and in Corpus Juris. 40 Words and Phrases, Perm.Ed., pp. 323–333, 60

C.J. pp. 655–667. An examination of the texts show that the inclusion of the particular object within the term, or its exclusion therefrom, usually depends upon the context and the purpose sought to be accomplished by the provision of which the term is a part. American Jurisprudence contains the statement that "Whether fences are buildings within the meaning of restrictions affecting buildings depends upon the form and purpose of the restriction." 14 Am.Jur. p. 626, Sec. 230.

The prohibition in the declaration of limitations is against the building of a house or structure of any kind, suggesting a broad rather than a restricted application of the term. The purpose of the prohibition appearing in paragraph 28 is to make useful and effective the reservation made in paragraph 27. The restriction is intended to prevent the construction on the reserved area of any house, building or other substantial structure of any kind, because any such house, building or other structure would probably interfere with the free use of the area for the installation and maintenance of water, gas, sewer, light, power and telephone lines. The fence built by respondent is substantial and permanent, seven feet high and constructed of posts set in the ground, rails and pickets. It is along or very nearly along the water, gas and sewer lines and it encloses the light and power poles and lines within respondent's yard. It is not merely a trivial annoyance, but is a material obstacle to the use of the reserved area for its intended purpose.

In this case, we do not believe HPT presents major interference to the operation and maintenance of the pipelines. But, we do not consider HPT a trivial annoyance either. Thus, we find that the asphalt tracks are structures intended to be prohibited under the easements.

■ 15. Defendants have argued that "structure" means "building." But, if this was the intent of the parties, the language of the easement which prohibits "any building or other structures" would be redundant. Therefore, we reject this argument.

16. We acknowledge the holding in *Public Service Co. v. Home Builders Ass'n*, 554 P.2d 1181 (Okla.1976), where the Oklahoma Supreme Court held that a driveway and parking lot over an electric company's right of way did not violate an easement barring "placement of any structure that may ... interfere with or endanger said underground electrical system." But, in that case, it was "undisputed" that in Tulsa, Oklahoma, the building trade did not equate driveways or parking lots with "structures." Furthermore, the grantor testified that he did not intend to prevent construction of a driveway or a parking lot. There was additional testimony that a broad construction of the term to prevent driveways, etc. would be contrary to customary business and development practices in the area. Such testimony is largely lacking in this case. Defendants presented the testimony of a pipeline engineer who stated that he did not believe the racing facility was a "structure" as he interpreted the easements. But, this witness was not directly testifying as to the intent of the grantor or the grantee. Nor was it clear that he was stating how the pipeline industry customarily interprets the term. Therefore, the court discounts the testimony of this witness.

17. Of course, not all structures are barred by the easements. Only structures which "interfere with the normal operation and maintenance" of the pipelines are prohibited. Defendants do not dispute the added expense and difficulty in maintaining or repairing a pipeline under an asphalt surface and fill dirt. Defendants contend, however, that the incremental effort and expense is not "abnormal" since the pipelines are crossed frequently by highways and railroads.

■ 18. We believe this argument returns us to the question of whether the racetracks are a trivial inconvenience or a genuine obstruction to the pipelines. This question is fundamental to the interpretation of the easements. *Tide–Water Pipe Company v. Blair Holding Company*, 42 N.J. 591, 202 A.2d 405, 412 (1964); *Stewart*

*v. Welsh, supra.* The law permits the owner of the servient tenement, the tract from which the easement interest is taken, to make any use of the property "which is consistent with or not calculated to interfere with the exercise of the easement granted." *Potter v. Northern Natural Gas Co.,* 201 Kan. 528, 441 P.2d 802, 805 (1968).

19. If trees and undergrowth, which the easements expressly designate for removal, can be considered interference, it is logical to believe the parties would consider the racetracks as interference. In addition, although highways and railroads frequently cross the pipelines, the vast majority of the land over the pipelines is not covered by asphalt or construction of any type. From this perspective, the "interference" offered by HPT is abnormal. Once again, our construction of the easements is consistent with the holdings of cases: *Rueckel v. Texas Eastern Transmission Corp.,* 3 Ohio App.3d 153, 444 N.E.2d 77 (1981) (trees on the right of way of a pipeline present a substantial interference); *Rees v. Panhandle Eastern Pipe Line Co.,* 176 Ind.App. 597, 377 N.E.2d 640 (1978) (trees and undergrowth); *Tide–Water Pipe Co. v. Blair Holding Co., supra,* 202 A.2d at 414 (building which prevents straight-down digging over pipelines interferes with easement rights); *Sumrall v. United Gas Pipe Line Co.,* 232 Miss. 141, 97 So.2d 914 (1957) (lake over pipeline); but see, *Public Service Co. v. Home Builders Ass'n, supra; Babler v. Shell Pipe Line Corp.,* 34 F.Supp. 10 (E.D. Mo.1940) (building over pipeline does not violate easement).[1]

20. The fences proposed for HPT are not "structures" which interfere with the normal operations of the pipelines. The easements contemplate fences on the property. Fences, though not the type of fences to be used at HPT, are not inconsistent with agricultural land use anticipated by the grantors and grantee. Furthermore, the fences do not unreasonably interfere with plaintiff's rights of ingress and egress, maintenance, monitoring and operation of the pipelines.

21. Similarly, the court finds that the concrete barriers will not materially interfere with the normal maintenance and operation of the pipelines. The barriers can be moved with a tractor or forklift. They should not unduly hamper the exercise of plaintiff's easement rights.

22. The tramways projected for HPT also should not violate plaintiff's easement rights since these paths will not be built up or hard-surfaced like the racetracks.

23. The City of Topeka owns the property below the asphalt tracks. Through statute, the Legislature has granted cities such as the City of Topeka a general right to exercise the power of eminent domain. K.S.A. 26–201. The power of eminent domain is the power to appropriate private property for public use upon the compensation of the private owner. *Ottawa Hunting Ass'n v. State,* 178 Kan. 460, 289 P.2d 754, 758 (1955). No eminent domain proceedings have been initiated, however.

24. Inverse condemnation actions have long been recognized in Kansas when land or rights therein are appropriated by a public corporation having rights of eminent domain without first procuring title. *Sanders v. State Highway Commission,* 211 Kan. 776, 508 P.2d 981, 985–85 (1973). The landowner may waive formal condemnation proceedings and other formal modes of acquisition and sue to recover compensation, under the doctrine of inverse condemnation. *Id.*

25. Plaintiff has suggested that eminent domain does not apply to these

---

1. There are other cases where pipeline easements have been enforced against various obstructions. These cases are distinguishable because they involve changes in the path of the pipeline or increased stress upon the pipeline. *Tenneco, Inc. v. May,* 377 F.Supp. 941 (E.D.Ky. 1974) (road over pipeline which required encasing the pipeline); *Mississippi River Transmission v. Wachter Construction,* 731 S.W.2d 445 (Mo. App.1987) (parking lot and fill dirt increased stress on pipeline); *Industrial Gas Co. v. Jones,* 62 Ohio App. 553, 24 N.E.2d 830 (1939) (coal waste which could corrode pipeline).

facts because HPT does not constitute a public use of land. In this connection, plaintiff notes the substantial private interest of defendant Lario in the project. The court disagrees with plaintiff's contention for two reasons. First, the City has a major interest in this project. The City has contributed $7.5 million, and it shall own land and improvements at HPT for 23 years. Second, the development of recreational facilities and the facilitation of economic development in partnership with private enterprise have been considered legitimate public purposes for the exercise of eminent domain and the expenditure of public money. See *Ottawa Hunting Ass'n v. State, supra,* 289 P.2d at 758 (condemnation of private property for fish and game preserve considered an effort to improve recreational facilities for state's citizens); *Duckworth v. City of Kansas City,* 243 Kan. 386, 758 P.2d 201 (1988) (loan from city to private developer to remodel downtown building promotes public purpose of economic revitalization); *State v. City of Topeka,* 176 Kan. 240, 270 P.2d 270 (1954) (city may condemn land for parking facility and lease the facility to a private corporation); *Frum v. Little Calumet River Basin Development Authority,* 518 N.E.2d 809, 811 (Ind.App.1988) (eminent domain approved for construction of marina to be leased to a private party); *State v. Daytona Beach Racing & Recreational Facilities Dist.,* 89 So.2d 34 (Fla.1956) (bond money for racetrack to be operated by private corporation not less than six months a year for 40 years furthers public purposes of increasing trade and providing recreation).

26. Plaintiff's use of its easement rights also constitutes a public use. "If ... a condemnor to whom the power of eminent domain has been delegated, such as a municipality or a private corporation, seeks to exercise the power with respect to property already devoted to a public use, the general rule is that where the proposed use will either destroy such existing use or interfere with it to such an extent as is tantamount to destruction, the exercise of the power will be denied unless the legislature has authorized the acquisition either expressly or by necessary implication." 1

J. Sackman, NICHOLS ON EMINENT DOMAIN § 2.2 at p. 2–57 (1978); see also, *Washington Metropolitan Area Transit Authority v. One Parcel of Land,* 514 F.2d 1350, 1352 (D.C.Cir.1975) (adopting passage from *Nichols* ); *City of Norton v. Lowden,* 84 F.2d 663, 665 (10th Cir.1936) (city may not "substantially destroy or materially interfere with existing public use" without specific legislative authorization).

27. While the construction of HPT does interfere with the normal operation and maintenance of the pipelines, it does not interfere so much as to destroy or be tantamount to the destruction of the pipelines. Indeed, the interference is minimal, not material, in the court's view. The City of Topeka is entitled to "take" plaintiff's easement rights to the extent it has with the construction of HPT, since the City's use of the land and plaintiff's use of the land may coexist. See *NICHOLS, supra,* at § 2.2[8] (if physical conditions are such that both uses may exist simultaneously it is immaterial that some inconvenience may be caused to the original user).

28. Plaintiff is requesting a mandatory injunction, that is, an injunction that will disturb the status quo. "A party seeking a mandatory injunction must be clearly entitled to such relief before it will be rendered." *Clawson v. Garrison,* 3 Kan. App.2d 188, 592 P.2d 117, 128 (1979) (citing *Prophet v. Builders, Inc.,* 204 Kan. 268, 273, 462 P.2d 122 (1969)); see also, *Cave v. Henley,* 125 Kan. 214, 264 P. 25, 27 (1928) (quoting *A.T. & S.F. Ry. Co. v. Long,* 46 Kan. 701, 27 P. 182 (1891)); *Zurn Constructors, Inc. v. B.F. Goodrich Co.,* 685 F.Supp. 1172, 1180–81 (D.Kan.1988).

29. The propriety of injunctive relief involves a consideration of a variety of factors:

(a) the nature of the interest to be protected,

(b) the relative adequacy to the plaintiff of injunction and of other remedies,

(c) any unreasonable delay by the plaintiff in bringing suit,

(d) any related misconduct on the part of the plaintiff,

(e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied,

(f) the interests of third persons and of the public, and

(g) the practicability of framing and enforcing the order or judgment.

RESTATEMENT (Second) OF TORTS § 936 (1979).

 30. In this case, plaintiff's property interest is an appropriate subject for injunctive relief. Plaintiff is not guilty of unreasonable delay or misconduct. Nor does it appear that the injunction plaintiff has requested would be impractical to frame and enforce. A consideration of the other factors, however, has persuaded this court that an injunction should not be issued.

31. The court has determined that the doctrine of inverse condemnation may be applied to these facts. The law recognizes that a condemnor may take property rights already devoted to a public use if the two uses are compatible. Thus, the law dictates in this situation that compensation in damages is the only remedy available to plaintiff. Plaintiff has not rebutted the existence of this remedy. Therefore, injunctive relief should not be ordered.

32. Even if inverse condemnation was not applicable to these facts, the court would still reject a permanent injunction against HPT for three reasons. First, a damages claim for the increased cost of excavation would provide an adequate remedy for the hindrance presented by the racetracks. Such a claim could be made after the excavation. There is no reason to believe that such claims would be so numerous that a damages claim would be impractical.[2] Second, the relative hardship to defendants from an injunction far outweighs any benefit to plaintiff. This is not disputed by plaintiff. However, plaintiff contends this factor should be ignored because of defendants' intentional violation of plaintiff's easement rights. The court

agrees that a balance of harms analysis should include a consideration of the good faith or bad faith of a defendant. Such an analysis, however, may consider the clarity or obscurity of the relevant rules of law, as well as other factors. RESTATEMENT (Second) OF TORTS § 941 Comment b (1982). In this instance, it is a close question whether HPT conflicts with plaintiff's easement rights. The court has determined that plaintiff's easement rights have been violated. But, the case law is conflicting and not directly on point. Additionally, the easement language is ambiguous. Moreover, defendants have acknowledged plaintiff's egress and ingress rights and have stated an intention to cooperate with plaintiff's exercise of these rights. All of these factors lead the court to conclude that plaintiff's allegations of bad faith should not prevent the court from considering the relative hardship of an injunction against the defendants. See *Wilkins v. Diven*, 106 Kan. 283, 187 P. 665 (1920) (where intentional deprivation of easement does not seriously affect enjoyment of property, injunctive relief denied and easement owner left with action for damages); *Cave v. Henley, supra* (where unintentional encroachment on neighboring property is slight and removal would cause heavy loss to defendant, injunction will be denied and plaintiff will be left to an action at law); *National Lead Co. v. Kanawha Block Co.*, 288 F.Supp. 357 (S.D.W.Va.1968) *aff'd*, 409 F.2d 1309 (4th Cir.1969) (denial of injunction against expanded use of easement in violation of servient landowner's rights where equities weigh against the injunction); *Johnson v. Shaw*, 101 N.H. 182, 137 A.2d 399 (1957) (reversal of injunction against motel built in violation of deed restrictions against overnight cabins on grounds that the trial court should have balanced the equities); *Meade v. Collins*, 242 S.W.2d 605 (Ky.App.1951) (damages awarded, injunction denied against barn constructed on right-of-way).

**2.** While interference with plaintiff's surveillance efforts may be continual, the court considers this inconsequential. See *Rossi v. Sierchio*, 30 N.J.Super. 575, 105 A.2d 687, 691 (N.J.App.1954)

("[w]here the damages are nominal, surely equity will not presume that plaintiff will subject himself to ... repeated lawsuits.").

33. Finally, the court may consider the interests of third persons and the public in this matter. *Koseris v. J.R. Simplot Co.,* 82 Idaho 263, 352 P.2d 235 (1960) (reversal of injunction against fertilizer plant emitting dust, smoke and obnoxious odors across plaintiff's property on the grounds that trial court failed to consider evidence of the financial impact of the million dollar plant upon the community). The City of Topeka and its citizens have made a sizable investment in HPT with the expectation that substantial revenues will be generated by the racetrack and that a fine recreational facility will be established. Obviously, these interests would be damaged by the injunction requested by plaintiff.

34. Although this matter has not been formally addressed to a significant extent, the court understands that, logically, if an injunction against HPT was issued, it would be used as a lever to have defendants pay for the relocation of the pipelines. Given the court's broad equitable powers, the court could consider an order requiring the relocation of the pipelines as an alternative remedy. Little evidence has been presented on this point. But, absent a safety risk from the operation of HPT over the pipelines, the court has no reason to believe that the substantial cost of relocating the pipelines should be suffered by any party in this case.

35. In conclusion, plaintiff's prayer for a permanent injunction against HPT is denied. On this record, the court shall refuse to require defendants to pay for the relocation of the pipelines. The court would look favorably upon a motion to amend plaintiff's complaint to require defendant City to initiate condemnation proceedings or to bring an inverse condemnation action against defendant City of Topeka. Such a motion should be filed within 30 days. Otherwise, plaintiff's complaint shall be dismissed.

IT IS SO ORDERED.