942 F.2d 1519
 MID-AMERICA PIPELINE COMPANY, Plaintiff-Appellant-Cross-Appellee,
v.
LARIO ENTERPRISES, INC., and the City of Topeka, Kansas,
Defendants-Appellees-Cross-Appellants.
 Nos. 89-3231, 89-3246.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 30, 1991.
Rehearing Denied Oct. 17, 1991.
 
 Leonard J. Johnson (David C. Stout with him on the briefs) of Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo. and James L. Grimes of Cosgrove, Webb & Oman, Topeka, Kan., for plaintiff-appellant-cross-appellee.
 Gerald L. Goodell (Leslie E. Diehl of
 Goodell, Stratton, Edmonds & Palmer; Stephen P. Weir and Edwin P. Carpenter of Carpenter, Weir & Myers, with him on the briefs) of Goodell, Stratton, Edmonds & Palmer, Topeka, Kan., for defendants-appellees-cross-appellants.
 Before BALDOCK and BRORBY, Circuit Judges, and ANDERSON,* District Judge.
 BRORBY, Circuit Judge.
 
 
 1
 Mid-America Pipeline Company ("MAPCO" or Appellant) seeks equitable relief from the construction of Heartland Park Topeka (HPT), a newly-built automobile raceway that partially overlies MAPCO's pre-existing high-pressure liquid gas pipeline easements. MAPCO appeals the United States District Court for the District of Kansas's denial of an injunction mandating the removal of the offending parts of the racetrack. HPT's owners, Lario Enterprises and the City of Topeka, Kansas (collectively, "Lario") cross-appeal certain rulings of the district court. The Memorandum and Order denying injunctive relief is published as Mid-America Pipeline Co. v. Lario Enters., 716 F.Supp. 511 (D.Kan.1989).
 
 
 2
 Jurisdiction in the district court was based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Our jurisdiction arises under 28 U.S.C. § 1292(a)(1).
 
 Facts
 
 3
 MAPCO purchased certain easements across undeveloped farmland in 1960, and duly recorded the easements. MAPCO selected the path of the easements so as to avoid developed property. Mid-America, 716 F.Supp. at 514. The easements define a sixty-foot wide right of way and provide substantial rights, which are reprinted at length in Mid-America, id. at 513-14. The relevant easement provision states:
 
 
 4
 Grantor shall have the right to fully use and enjoy the above described premises subject to the rights herein granted. Grantee shall have the right to clear and keep clear all trees, undergrowth and other obstructions from the herein granted right of way, and Grantor agrees not to build, construct or create, nor permit others to build, construct or create any buildings or other structures on the herein granted right of way that will interfere with the normal operation and maintenance of the said line or lines.
 
 
 5
 Id. MAPCO drew the easement language. Id. at 514. MAPCO subsequently installed two high-pressure liquid gas pipelines through the easements. Id. at 513. The pipelines were buried at a depth of thirty to forty-eight inches. Id.
 
 
 6
 MAPCO's officers learned of Lario's plans to build HPT in the summer of 1988, and promptly informed Lario of its easement rights and objections to the planned construction. Id. at 514. Lario had both actual and constructive notice of MAPCO's easements and the existence of its gas pipelines prior to its construction of HPT. MAPCO filed this lawsuit on August 30, 1988. Lario subsequently deeded certain areas of HPT, including parts of the pipeline easements, to the City of Topeka, with agreement that the land and project would be reconveyed to Lario after a term of twenty-three years. MAPCO then joined the City as a defendant.
 
 
 7
 Substantial construction of HPT has occurred since the filing of the lawsuit, and has continued in light of the district court's denial of MAPCO's request for a preliminary injunction. The court described the existing and planned parts of HPT that are located above the gas pipelines in the following terms:
 
 
 8
 Currently, four racetrack surfaces approximately 36 feet in width cross over the pipelines. A drag strip approximately 60 feet in width also crosses the pipelines. These surfaces are composed of 7 1/2 inches of asphalt over a 12 inch fly ash/clay base. The base is a mixture of materials designed to set up like concrete. The depth of the cover has been increased over the pipelines in some areas by as much as 12 to 20 feet. It is anticipated that moveable concrete barriers weighing approximately 8,000 pounds apiece shall border the racetrack. Two chain link fences will cross the pipelines in four locations. Additionally, two tram roadways that will also cross the pipelines are contemplated in the future.
 
 
 9
 716 F.Supp. at 514.
 
 
 10
 The court found the asphalt covering, the fly ash/clay base, and the fill dirt would render the task of excavating the pipelines "more difficult, time-consuming and expensive." Id. However, given the history of the pipelines, the court concluded the probability that excavation would be necessary "appears remote." Id. at 515. Nevertheless, addressing the language of the easements, the court held:
 
 
 11
 The asphalt tracks of HPT are 'structures which interfere with the normal operation and maintenance of the
 
 
 12
 [pipe]lines' and, therefore, violate plaintiff's easement rights.
 
 
 13
 Id. The court also noted, "[o]f course, not all structures are barred by the easements. Only structures which 'interfere with the normal operation and maintenance' of the pipelines are prohibited." Id. at 516.
 
 
 14
 Reasoning from the terms of the easement, the court concluded "[i]f trees and undergrowth, which the easements expressly designate for removal, can be considered interference, it is logical to believe the parties would consider the racetracks as interference." Id. at 517. The court found otherwise with respect to the fences, concrete barriers, and tramways, concluding they do not unreasonably or materially interfere with the normal operations and maintenance of the pipelines. Id.
 
 
 15
 The court also considered the much-disputed safety implications of operating the racetrack over the liquid gas pipelines. The propane and ethane gases transported in the pipelines are heavier than air and, in leak situations, pose a danger of accumulation at ground level and explosion. MAPCO claims HPT interferes with its ability to detect pipeline leaks by obscuring the easement from the by-weekly overflights MAPCO uses to look for the dead vegetation or ice plugs that indicate a gas leak. MAPCO further claims HPT will increase the cost and decrease the accuracy of its close-interval cathodic surveys--a means of electrically testing the corrosion resistance of the pipes. MAPCO is also concerned about the increased danger and delay involved in the task of digging down to the pipelines through the asphalt racetracks and increased overburden--perhaps in the presence of explosive gases and under emergency circumstances. Lario argues that because MAPCO never had to dig up the pipes before, and because the pipes have now been inspected, repaired, and certified safe, there is no safety problem.
 
 
 16
 The court in essence agreed with Lario, citing the lack of prior leaks or problems at the HPT site, the present safe condition of the pipelines, and the comprehensive pipeline-monitoring system used by MAPCO to detect leaks. 716 F.Supp. at 514. The court concluded the probability that pipeline excavation will be necessary "appears remote," and "absent a safety risk from the operation of HPT over the pipelines, the court has no reason to believe that the substantial cost of relocating the pipelines should be suffered by any party in this case." Id. at 515, 520.
 
 
 17
 The district court refused to grant an injunction mandating the removal of the racetracks or any other aspect of HPT from the easements. The court offered three grounds in explaining its denial of the injunction: "plaintiff has an adequate remedy in condemnation or damages; an injunction would place an unfair hardship upon defendants; and, an injunction would not be in the interests of the public." Id. at 513.
 
 Issues Raised
 
 18
 MAPCO appeals the court's denial of injunctive relief. Lario argues on cross-appeal that although the district court correctly denied injunctive relief, it erred in finding the asphalt tracks are "structures" under the easements and in finding the tracks "interfere with the normal operation and maintenance" of the pipelines.
 
 Standard of Review
 
 19
 We apply the law of the forum state in determining whether to grant mandatory injunctive relief in diversity cases. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); Genovese Drug Stores, Inc. v. Bercrose Assocs., 563 F.Supp. 1299, 1304 (D.Conn.1983) ("Where injunctive relief is sought, a federal court must look to state law to determine whether a party is entitled to equitable remedial rights."). See also United States v. O'Block, 788 F.2d 1433, 1435 (10th Cir.1986) (absent controlling federal law, questions involving real property rights are resolved under state law); 2 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice p 2.09 (1990) ("Assuming a case is in the federal court solely because of diversity and that the right to be adjudicated concerns only local law then the parties are entitled to the same substantial treatment they would get in the same [state] court.").
 
 
 20
 We review the state law determinations of the district court de novo, according no deference. Salve Regina College v. Russell, --- U.S. ----, ----, 111 S.Ct. 1217, 1221-25, 113 L.Ed.2d 190 (1991). Although Erie dictates we apply Kansas law to the merits of this case, as a matter of independent federal procedure we utilize the normal federal standards of appellate review to examine the district court's decision process. Cf. Manchester Pipeline Corp. v. Peoples Natural Gas Co., 862 F.2d 1439, 1444 (10th Cir.1988) (federal standards applied in review of sufficiency of evidence and motion for new trial in diversity case). Therefore, in this appeal, legal conclusions reached by the federal district court are reviewed de novo, while findings of fact are examined for clear error. Fox v. Mazda Corp. of America, 868 F.2d 1190, 1194 (10th Cir.1989) (quoting Pierce v. Underwood, 487 U.S. 552, 558, 108 S.Ct. 2541, 2546, 101 L.Ed.2d 490 (1988)).
 
 Analysis
 
 21
 Applying de novo review, we are convinced the district court's decision does not properly reflect Kansas law. The district court largely derived its legal conclusions by applying the seven-part test of the Restatement (Second) of Torts § 936 (1979).[1] See Mid-America, 716 F.Supp. at 518-20. Under § 936, the court focused on the adequacy of legal remedies, the relative hardship to the parties, and the interests of the public. Id. at 519-20. As we have found no Kansas case adopting, using, or even citing Restatement (Second) of Torts § 936, our de novo review must consider whether the district court's analysis comports with Kansas authority. We note the district court did not have the benefit of the Kansas Supreme Court's recent decision in Mid-America Pipeline Co. v. Wietharn, 246 Kan. 238, 787 P.2d 716 (1990).
 
 
 22
 "As a court sitting in diversity, we must apply a state supreme court's most recent statement of state law." Southwest Forest Indus., Inc. v. Sutton, 868 F.2d 352, 354 (10th Cir.1989) (citing Robinson v. Volkswagen of America, Inc., 803 F.2d 572, 574 (10th Cir.1986)), cert. denied, --- U.S. ----, 110 S.Ct. 1320, 108 L.Ed.2d 496 (1990). Wietharn, the Kansas Supreme Court's most recent statement concerning that state's law on mandatory injunctions, is especially significant because it involved the same plaintiff, MAPCO, asserting rights under easement language identical to that before this court. 787 P.2d at 718. Wietharn reversed the trial court's denial of an injunction mandating the removal of several buildings from MAPCO's pipeline easement, and in so doing resolved certain issues that are raised in the present case. Id. 787 P.2d at 719-25.
 
 
 23
 Wietharn states the law of injunctive relief in Kansas in these terms:
 
 
 24
 Mandatory injunctions require performance of an act, while preventive, or prohibitory, injunctions require a party to refrain from doing an act. To obtain injunctive relief from prospective injury, a party must show that a reasonable probability of injury exists and that an action at law will not provide adequate remedy. Mere apprehension or possibility of wrong or injury ordinarily does not warrant the granting of an injunction.
 
 
 25
 ... A mandatory injunction is an extraordinary remedy used to effectuate full and complete justice by commanding the performance of a positive act. Although the granting of a mandatory injunction is governed by the same rules as the granting of preventive injunctions, courts are more reluctant to grant a mandatory injunction. Therefore, usually only prohibitory injunctions are entered. A party seeking a mandatory injunction must clearly be entitled to that form of relief.
 
 
 26
 Id. 787 P.2d at 719-20 (citations omitted). Thus, Wietharn sets out three requirements for the issuance of a mandatory injunction under Kansas law: (1) the party seeking injunctive relief must show that a reasonable probability of injury exists; (2) the party must show that there is no adequate remedy at law; and (3) the party must clearly be entitled to a mandatory injunction. Id.; Prophet v. Builders, Inc., 204 Kan. 268, 462 P.2d 122, 126 (1969).
 
 
 27
 We note initially that the Wietharn requirements do not include two of the three bases for the district court's holding in this case--specifically, the balancing of equities and the weighing of the public interest. Indeed, Wietharn expressly rejected the balancing of equities where the respondent acts with knowledge of the easement or pipeline and is therefore not "innocent." Wietharn, 787 P.2d at 725. In rejecting the balancing of equities, the Kansas Supreme Court adopted "Mid-America['s] argu[ment] that the trial court should not have balanced equities after finding that the easement rights were violated because the Wietharns could not claim to be innocent respondents." Id. 787 P.2d at 722. After surveying cases, the court concluded:
 
 
 28
 The respondents were not innocent parties acting without knowledge of the easement or the pipeline. It is difficult, if not impossible, to imagine how the construction of buildings or structures could interfere more with the normal operation and maintenance of the pipeline than the buildings constructed by the respondents in the present case. To find otherwise would render the previously quoted language in the easement meaningless and Mid-America's rights thereunder illusory.
 
 
 29
 Since Mid-America has clearly defined rights under the easement that are recognized and protected by law, the district court should not have balanced the equities.
 
 
 30
 Id. 787 P.2d at 725.
 
 
 31
 In this case, despite its professed belief that HPT would not interfere with MAPCO's easement rights, Lario did not proceed in the construction of HPT "without knowledge or warning" of MAPCO's property rights. See id. 787 P.2d at 722 (quoting Papanikolas Bros. Enters. v. Sugarhouse Shopping Center Assocs., 535 P.2d 1256, 1259 (Utah 1975)). Lario is therefore not "innocent" and not entitled to a balancing of equities under controlling Kansas law. After examining Wietharn, we are constrained to hold the district court erred in balancing the equities in this case. 787 P.2d at 725.
 
 
 32
 It is clear the district court's utilization of the Restatement (Second) of Torts § 936 analysis is not in accord with Kansas authority. We now address whether the requirements for the issuance of a mandatory injunction, as set out in Wietharn, have been met in this case.
 
 1. Injury
 
 33
 We first review the district court's construction of the easement language and its holding that HPT interferes with MAPCO's easement rights. See 716 F.Supp. at 517. Material interference with MAPCO's reasonable enjoyment of the easement would constitute injury potentially entitling MAPCO to a mandatory injunction. See Aladdin Petroleum Corp. v. Gold Crown Properties, Inc., 221 Kan. 579, 561 P.2d 818, 825 (1977).
 
 
 34
 Under Kansas law, the character and extent of rights created by a grant of easement is determined by construction of the language of the grant. Potter v. Northern Natural Gas Co., 201 Kan. 528, 441 P.2d 802, 805 (1968). " 'A cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistent with legal principles.' " Garvey Center, Inc. v. Food Specialties, Inc., 214 Kan. 224, 519 P.2d 646, 650 (1974) (quoting Hamann v. Crouch, 211 Kan. 852, 508 P.2d 968, 973-74 (1973)). Moreover, "reasonable rather than unreasonable interpretations are favored by the law. Results which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided." Garvey Center, 519 P.2d at 649 (quoting Weiner v. Wilshire Oil Co. of Texas, 192 Kan. 490, 389 P.2d 803 (1964)). The construction of the written instrument and the existence of ambiguity are questions of law. Kennedy & Mitchell, Inc. v. Anadarko Prod. Co., 243 Kan. 130, 754 P.2d 803, 805-06 (1988).
 
 
 35
 As noted, the easement contracts at issue prohibit the creation of "any buildings or other structures on the herein granted right of way that will interfere with the normal operation and maintenance" of the pipelines. MAPCO argues "the trial court erred in holding that fences, concrete barriers, additional dirt fill, perimeter roads and other racetrack appurtenances do not violate and interfere with" its easement rights. Lario argues those aspects of HPT are not prohibited "structures" under the easement, asserts the easement contract is ambiguous, and claims the district court erred in adopting a definition of "structures" that favors MAPCO.
 
 
 36
 Ambiguity is found "only when words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings." Anadarko, 754 P.2d at 806. We agree with Lario's contention that the word "structure" is ambiguous, as it may be understood to reach two or more meanings--hence the disagreement among various courts as to the word's proper definition. See Mid-America, 716 F.Supp. at 515-16. However, we reject Lario's implication that, like an insurance policy, the easement at issue is an adhesion contract requiring narrow construction of its terms against the drafter.
 
 
 37
 Finding ambiguity, we apply the "cardinal rule" of construction by ascertaining the intention of the parties to the easement contract and giving effect to their intention. See In re Estate of Murphy, 226 Kan. 424, 601 P.2d 1096, 1099 (1979); Garvey Center, 519 P.2d at 650; Crouch, 508 P.2d at 973-74. We agree with the district court's conclusion that:
 
 
 38
 [I]t is reasonable to assume that the grantee intended to bar asphalt surfaces from crossing the easements because plaintiff plotted the pipelines to avoid developed property. It is also reasonable to assume that the grantors did not have a contrary intent, since the property was used for pasture and agriculture for decades before and after the easements were executed. This construction conforms with the dictionary definition of "structure."
 
 
 39
 716 F.Supp. at 515. Despite the facial ambiguity of the contract term, consideration of the parties' intent establishes that the racetracks are "structures" in the meaning of the contract.
 
 
 40
 The district court rejected Lario's argument that "structures" is synonymous with "buildings." Id. at 516. We concur. Otherwise, apart from citing nonbinding, contrary authority, Lario does not suggest what the parties might reasonably have meant by the term "structures." Looking to the intent of the parties, we are unable to perceive why barns, stock-watering tanks, or windmills, for instance, would be considered interfering "structures" if four 36 feet wide asphalt racetracks and a 60 feet wide asphalt drag strip are not. As the same logic applies to the fences, concrete barriers, and additional cover, we hold they are also "structures" under these facts. The proposed perimeter tracks, which are simple gravel roads, are not "structures". This resolution respects the rule that "[t]he circumstances under which the contract was made, will be considered to show the intent of the parties." United States v. Kansas Gas & Elec. Co., 215 F.Supp. 532, 542 (D.Kan.1963).
 
 
 41
 The next disputed issue is whether these structures "interfere with the normal operation and maintenance" of MAPCO's pipelines. This is a mixed question of law and fact involving contract construction and factual determinations concerning the actual impacts of the structures. We ask whether the impacts found by the district court constitute "interference" in the meaning of the easement contract. De novo review is appropriate in the case of such mixed questions. Pittsburg & Midway Coal Min. Co. v. Yazzie, 909 F.2d 1387, 1393-94 (10th Cir.) (de novo review applied where issue of statutory construction was a mixed question which turned on historical record, but primarily involved legal principles), cert. denied, --- U.S. ----, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990).
 
 
 42
 The district court found the asphalt surface hampers MAPCO's biweekly aerial surveillance of the pipelines and impairs the close-interval surveys. 716 F.Supp. at 514. The court found the racetracks and additional fill render excavation of the pipelines more difficult, time-consuming, and expensive. Id. The court also noted "[d]efendants do not dispute the added expense and difficulty in maintaining or repairing a pipeline under an asphalt surface and fill dirt." 716 F.Supp. at 516. Lario disputes the significance of these findings by asserting the interference presented by HPT is immaterial.
 
 
 43
 In Aladdin, the Kansas Supreme Court stated:
 
 
 44
 "An obstruction or disturbance of an easement is anything which wrongfully interferes with the privilege to which the owner of the easement is entitled by making its use less convenient and beneficial than before. To constitute an actionable wrong it must, however, be of a material character such as will interfere with the reasonable enjoyment of the easement...."
 
 
 45
 561 P.2d at 825 (quoting 28 C.J.S. Easements § 96). See Wietharn, 787 P.2d at 720-21. Under Aladdin, we have no difficulty concluding the asphalt racetrack and increased cover at HPT materially interfere with MAPCO's operation and maintenance of its pipelines. The racetracks and overburden--which was increased to a depth of twenty feet in some areas--impair MAPCO's ability to detect leaks. 716 F.Supp. at 514. The racetracks and overburden will also increase the costs and difficulty of digging down to the pipelines, should doing so become necessary. Id. We hold this level of interference is material. To hold otherwise would defy common sense.
 
 
 46
 Lario argues any interference caused by HPT is "normal" compared to the interference tolerated by MAPCO in other locations where roads and highways cross the same pipelines. The interference MAPCO must tolerate elsewhere is largely irrelevant. It is axiomatic that "[a] court may not make an agreement for the parties which they did not make themselves." Potter, 441 P.2d at 806. To require MAPCO to tolerate new interference with the maintenance of its pipelines at HPT simply because it must bear similar interference elsewhere "would have the effect of inserting an additional provision in the original grant requiring the grantee to furnish additional consideration for the rights granted and received by it." Id. Lario does not and cannot plausibly argue that the normal operation and maintenance of MAPCO's pipelines at HPT--including aerial surveillance, cathodic surveying, and excavation when necessary--is not now substantially more difficult and costly than it was prior to the construction of HPT. Lario's argument is therefore rejected.
 
 
 47
 We agree with the district court's holding that the interference caused by the fences and concrete barriers is not material. 716 F.Supp. at 517. The record contains no evidence suggesting these aspects of HPT will substantially impede leak detection or cathodic surveillance of the pipelines. The fences and barriers are distinguishable from trees and shrubbery (obstructions MAPCO is entitled to remove) as they obscure no significant amount of ground from view. Finally, as the fences and barriers are readily movable, they need not interfere with pipeline excavation or cathodic surveys.
 
 
 48
 We hold the asphalt racetracks and increased overburden at HPT materially interfere with MAPCO's easement rights. Such material interference constitutes injury that is actionable under Wietharn, 787 P.2d at 720, and Aladdin, 561 P.2d at 825. Having determined that MAPCO is injured, we next consider whether an action at law will adequately remedy MAPCO's injury. Wietharn, 787 P.2d at 719.
 
 2. Adequacy of Remedies at Law
 
 49
 MAPCO argues the district court erred in holding MAPCO has an adequate remedy at law. Appellees respond MAPCO has an adequate remedy in inverse condemnation. The parties agree the City owns the land under the racetracks and possesses eminent domain power.
 
 
 50
 The court stated its conclusions of law with regard to the remedy of inverse condemnation in the following passage:
 
 
 51
 The court has determined that the doctrine of inverse condemnation may be applied to these facts. The law recognizes that a condemnor may take property rights already devoted to a public use if the two uses are compatible. Thus, the law dictates in this situation that compensation in damages is the only remedy available to plaintiff. Plaintiff has not rebutted the existence of this remedy. Therefore, injunctive relief should not be ordered.
 
 
 52
 716 F.Supp. at 519.
 
 
 53
 Under Kansas law, inverse condemnation is a "remedy available to one whose land has been taken for public use." See Ventures in Property I v. City of Wichita, 225 Kan. 698, 594 P.2d 671, 678 (1979) (quoting Wittke v. Kusel, 215 Kan. 403, 524 P.2d 774, 776 (1974)). Inverse condemnation is an action initiated by the property owner which is available where private property actually has been taken for public use without formal condemnation proceedings and there is no intention or willingness on the part of the taker to bring the action to acquire the property. Ventures, 594 P.2d at 678. Actions in inverse condemnation enforce an obligation on the part of public entities to pay property owners the reasonable value of property or rights taken without compensation. Id.
 
 
 54
 An action in inverse condemnation is a means of seeking damages or compensation for the property interest taken. Hiji v. City of Garnett, 248 Kan. 1, 804 P.2d 950, 953 (1991). As such, inverse condemnation represents nothing more than a procedure by which MAPCO presumably could seek damages. We are thus presented with a single question: whether damages would adequately remedy HPT's material interference with MAPCO's easement rights.
 
 
 55
 The district court addressed the adequacy of damages, stating:
 
 
 56
 [A] damages claim for the increased cost of excavation would provide an adequate remedy for the hindrance presented by the racetracks. Such a claim could be made after the excavation. There is no reason to believe that such claims would be so numerous that a damages claim would be impractical.[2]
 
 
 57
 716 F.Supp. at 519.
 
 
 58
 MAPCO argues the district court's conclusion contradicts the holding in Wietharn, 787 P.2d 716, and Aladdin, 561 P.2d 818. While Aladdin and Wietharn concerned the wrongful erection of buildings that materially interfered with right-of-way easements, we nevertheless find their analysis applicable here, where the racetracks and overburden likewise materially interfere with MAPCO's easement rights. We agree that the district court's conclusion on the adequacy of damages contradicts Wietharn.
 
 
 59
 The Kansas Supreme Court granted a mandatory injunction ordering the removal of four buildings that were built over MAPCO's pipeline easement in Wietharn. 787 P.2d at 725. The court recognized that no mandatory injunction could issue if legal action was adequate to remedy the interference. Id. 787 P.2d at 719-21, 725. The court held "the Wietharns' construction of buildings on Mid-America's easement created a continuing violation that did not cease with the completion of the building.... The issuance of a mandatory injunction was appropriate to protect Mid-America's rights under the easement...." Id. 787 P.2d at 720. The court expressly found the remedy at law to be inadequate and granted the mandatory injunction, concluding "[w]here, as in the present case, the remedy at law is inadequate, equity will fashion a remedy that enforces that legal right. However, in so doing, equity will follow the law and not ignore it." Id. 787 P.2d at 725. The Kansas Supreme Court concluded the district court erred in failing to order the removal of the offending buildings. Id.
 
 
 60
 This holding is by no means anomalous: courts in many jurisdictions recognize that legal remedies are inadequate to redress ongoing or continuing violations. See, e.g., Berin v. Olson, 183 Conn. 337, 439 A.2d 357, 361 (1981) ("the circumstance that the injury or the potential for injury is of a continuing nature permits the intervention of equity"); Richard Paul, Inc. v. Union Improvement Co., 33 Del. Ch. 113, 91 A.2d 49, 54 (Supr.Ct.1952) ("the obstruction of an easement of itself is sufficient to show the irreparable nature of the injury and the inadequacy of the remedy at law"); Lynch v. Keck, 147 Ind.App. 570, 263 N.E.2d 176, 181 (1970) ("Where the obstructions are of a permanent and continuous nature and the damages for each day's obstruction are insignificant, the remedy of successive actions at law for such damages is inadequate, and equity will interpose by injunction"); Czarnick v. Loup River Pub. Power Dist., 190 Neb. 521, 209 N.W.2d 595, 599 (1973). See also, 25 Am.Jur.2d Easements and Licenses § 120 (1966 & Supp.1991); 28 C.J.S. Easements § 107 (1941).
 
 
 61
 Lario has not suggested that damages are more adequate in this case than in Wietharn. Lario cites several cases supporting the adequacy of a remedy by way of inverse condemnation. The cited cases, however, involve physical or regulatory takings and find damages adequate to remedy the challenged takings. In this case, given Lario's argument that HPT does not even constitute an interference with the easement, it is not at all clear that the construction of HPT would be adjudged a "taking" entitling MAPCO to compensation. And again, damages were found to be inadequate to remedy similar interference in Wietharn. 787 P.2d at 725.
 
 
 62
 Lario argues Wietharn is distinguishable because the parties therein "agreed" the buildings violated the easement, while this case presents "a close question as to whether HPT even violated the Plaintiff's easement rights under any interpretation. These differences clearly go to the Defendant's good faith herein." This argument fails because it ignores the rejection, by Wietharn and the cases cited with approval therein, of "good faith" analysis. See id. 787 P.2d at 722-23. In refusing to balance the relative equities between the parties, Wietharn rejected the significance of alleged good faith. We likewise discount the relevance of Lario's proffered good faith.
 
 
 63
 We are also not persuaded that safety concerns provide a basis for distinguishing Wietharn. The district court acknowledged a recent "explosion caused by a leak from the pipelines ... near HPT." 716 F.Supp. at 514. Neither the district court nor the parties to this lawsuit can predict the future safety of the pipelines at HPT. Because the injury found above involves material interference with MAPCO's leak detection capabilities, we decline to endorse the notion that safety concerns play no part in this case.
 
 3. Clear Entitlement
 
 64
 Wietharn reaffirmed that "[a] party seeking a mandatory injunction must clearly be entitled to that form of relief." 787 P.2d at 720. In Wietharn, the Kansas Supreme Court directed the state district court to issue an injunction mandating the removal of buildings that interfered with an easement created by the same contract language as that at issue in this case. Id. 787 P.2d at 718, 725. Wietharn does not explain why the Kansas Supreme Court considered the plaintiff to be "clearly ... entitled" to a mandatory injunction. Nevertheless, given the similarity of the two cases, we find Wietharn controlling on this issue.
 
 
 65
 Initially, we note that construction of the racetracks on plaintiff's easement, like the wrongful erection of buildings over the easement in Wietharn, "created a continuing violation that did not cease with the completion" of construction. Id. 787 P.2d at 720. As in Wietharn, the offending structures at issue here continue to interfere with MAPCO's enjoyment of its easement rights. Also, as in Wietharn, MAPCO diligently protested the racetrack construction and asserted its easement rights. See Mid-America, 716 F.Supp. at 514. As noted above, "[t]he respondents were not innocent parties acting without knowledge of the easement or the pipeline." Wietharn, 787 P.2d at 725. Finally, as in Wietharn, "Mid-America has clearly defined rights under the easement that are recognized and protected by law." Id.
 
 
 66
 Having held that the asphalt racetracks and increased overburden at HPT are structures that materially interfere with the normal operation and maintenance of the pipelines, and that an award of damages would not adequately remedy that interference, we now hold MAPCO's entitlement to relief in the form of a mandatory injunction is clear.
 
 Conclusion
 
 67
 Under Kansas law, the district court erred in balancing the equities between parties in this case. The racetracks and increased cover at HPT materially interfere with MAPCO's easement rights. Because there is no adequate remedy at law for this injury, MAPCO clearly is entitled to a mandatory injunction requiring the removal of materially interfering structures above its pipelines. The order of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Aldon J. Anderson, Senior United States District Judge for the District of Utah, sitting by designation
 
 
 [1]
 Section 936, "Factors in Determining Appropriateness of Injunction" reads in part:
 (1) The appropriateness of the remedy of injunction against a tort depends upon a comparative appraisal of all of the factors in the case, including the following primary factors:
 (a) the nature of the interest to be protected,
 (b) the relative adequacy to the plaintiff of injunction and of other remedies,
 (c) any unreasonable delay by the plaintiff in bringing suit,
 (d) any related misconduct on the part of the plaintiff,
 (e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied,
 (f) the interests of third persons and of the public, and
 (g) the practicability of framing and enforcing the order or judgment.
 
 
 [2]
 While interference with plaintiff's surveillance efforts may be continual, this court considers this inconsequential